THE ENSENADA ESTATES, INC., DEMANDANTE Y APELANTE, v. HILL, TESORERO INTERINO DE PUERTO RICO, DEMANDADO Y APELADO.

APELACIÓN procedente de la Corte de Distrito de San Juan, Sección Primera, en acción para recobrar dinero pagado bajo protesta por contribuciones.

No. 1329.—Resuelto en julio 28, 1916.

CONTRIBUCIONES—PAGO BAJO PROTESTA—DEVOLUCIÓN DE CONTRIBUCIONES—INTERPRETACIÓN DE ESTATUTOS.—La ley de marzo 9, 1911, que dispone el pago de contribuciones bajo protesta, etc., prescribe en substancia, que el contribuyente no impedirá, obstaculizará o demorará el cobro de ninguna contribución que se alegue o reclame como debida al Gobierno por injusta o ilegal que pueda ser dicha reclamación, sino que pagará la misma, esté o no debida, y prescindiendo de cualquiera o toda cuestión referente al derecho y justicia del caso; y como compensación por la pérdida de sus remedios en equidad y por la injusticia envuelta en dicho pago compulsivo, puede entonces demostrar, si está en condiciones de hacerlo, teniendo en cuenta los méritos del caso, que la cantidad fué injusta e indebidamente recaudada por no deberse, y debe ser reintegrada, en cuyo caso así lo certificará la corte y el Tesorero procederá a su reintegro.

ID.—ID.—JUNTA DE REVISIÓN E IGUALAMIENTO—REVISIÓN POR LAS CORTES—INTERPRETACIÓN DE ESTATUTOS.—El sostener la proposición de que por excesiva que pueda ser la valoración hecha por la Junta de Revisión e Igualamiento no demostrándose que haya habido fraude es definitiva y concluyente en lo que respecta al contribuyente y que no está sujeta a ser revisada por las cortes en una acción establecida para obtener la devolución de contribuciones pagadas bajo protesta, sería borrar del estatuto las palabras "todos los casos," "injusto" y "teniendo en cuenta los méritos del caso."

ID.—ID.—ACCIÓN PARA OBTENER LA DEVOLUCIÓN—INJUNCTION—ATAQUE COLATERAL—INTERPRETACIÓN DE ESTATUTOS.—La acción que se concede al contribuyente no es simplemente en sustitución del derecho a un *injunction* del cual se le priva expresamente, como tampoco es el procedimiento que tuvo presente la legislatura el de un mero ataque colateral. Es un procedimiento autorizado con el objeto de determinar no solamente si la contribución fué o no "ilegal o hecha contra las disposiciones de cualquier estatuto," sino también si la misma era o no "injusta" o "ilegalmente recaudada por no estar debida * * * teniendo en cuenta los méritos del caso."

ID.—ID.—VALORACIÓN HECHA POR LA JUNTA—REVISIÓN POR LAS CORTES—INTERPRETACIÓN DE ESTATUTOS.—Si la valoración definitiva hecha por la junta, ya se le considere en particular o en unión con otras circunstancias es de

tal modo excesiva que dé lugar a una verdadera y manifiesta opresión que equivalga a una injusticia clara y substancial, no deberá negarse al contribuyente que formula la protesta su acceso a las cortes por el solo fundamento de que no puede probar fraude o propósito deliberado por parte de los tasadores, o porque la acción de la junta técnicamente no es ilegal, o completamente contraria a cualquier estatuto; y si un demandante puede probar dicha injusticia sustancial, entonces las cortes pueden revisar y corregir la acción tomada por la junta en tanto sea necesario para determinar si las contribuciones en cuestión fueron o no injusta o ilegalmente cobradas y si deben ser reintegradas.

Los hechos están expresados en la opinión.

Abogado de la apelante: *Sr. Francis E. Neagle.*

Abogados del apelado: *Sres. Howard L. Kern, Attorney General,* y *R. W. Perkins, Jr., Attorney General Auxiliar.*

EL JUEZ ASOCIADO SR. HUTCHISON, emitió la opinión del tribunal.

Las secciones 1 a la 5, inclusive, de una ley titulada "Ley disponiendo el pago de contribuciones bajo protesta, estableciendo un procedimiento para exigir la devolución de las mismas, y para otros fines," aprobada en 9 de marzo de 1911, dicen lo siguiente:

"Sección 1.—En todo caso en que un funcionario, encargado por la ley de recaudar las contribuciones o rentas que se adeudan al Gobierno de Puerto Rico, inicie cualquier procedimiento o lleve a cabo algunas diligencias para la recaudación de contribuciones o rentas, bajo la alegación o reclamación hecha por dicho funcionario de que las adeuda alguna persona, la parte contra quien se lleve a efecto el procedimiento, o las diligencias, si cree que el cobro es injusto o ilegal, o que se hace contra las disposiciones de cualquier estatuto, pagará dichas contribuciones o rentas bajo protesta.

"Sección 2.—Después que se haya hecho ese pago, el funcionario o recaudador ingresará la cantidad recaudada en el Tesoro de Puerto Rico, dando conocimiento al Tesorero, en el momento del ingreso de que dicha cantidad se ha pagado bajo protesta.

"Sección 3.—La parte que pague esa contribución bajo protesta podrá en cualquier momento dentro del plazo improrrogable de treinta días después de haber hecho el pago demandar al mencionado Tesorero ante la corte de jurisdicción competente para ello para obtener la devolución de la citada suma; y si se decidiere, teniendo en cuenta los méritos del caso, que la cantidad fué recaudada injustamente, pues-

to que el demandante no la adeudaba al Gobierno, el tribunal que conozca del asunto podrá certificar, de acuerdo con las constancias del mismo, que las contribuciones de referencia fueron pagadas sin existir razón para ello, y que deben ser reintegradas, e inmediatamente el Tesorero procederá a su reintegro, dando preferencia a ese pago sobre cualquier otra reclamación que se haya hecho al Tesorero. Cada una de las partes en dicho pleito tendrá el derecho de apelación para ante el Tribunal Supremo.

"Sección 4.—No se dará ningún otro recurso en casos de recaudación ilegal de contribuciones o rentas o en casos de tentativas para recaudar ilegalmente contribuciones o rentas.

"Sección 5.—En ningún caso se expedirá auto alguno para impedir la recaudación de contribuciones o rentas devengadas, o para obstaculizar y demorar esa recaudación ya se trate de un *supersedeas,* un auto prohibitorio, o cualquier otro auto o procedimiento; y en todos los casos en que, por cualquier motivo una persona alegue que la contribución que se le ha cobrado fué recaudada injusta o ilegalmente el recurso que ha de utilizar dicha persona es el que queda determinado antes, y ningún otro."

La demandante y apelante establece su acción de acuerdo con esta ley y alega, entre otras cosas, lo siguiente:

"4. Que el demandante es y ha sido dueño durante algún tiempo y ha tenido y poseído ciertos terrenos, y es y ha sido dueño de cierta maquinaria, edificios y otras propiedades en la Isla de Puerto Rico, sobre los cuales el Gobierno de Puerto Rico ha impuesto ciertas contribuciones, estando situadas dichas propiedades en el Distrito Municipal de Guánica, Puerto Rico.

"5. Que posteriormente y entre los meses de enero y agosto de 1913, ambos inclusives, al cumplir con las disposiciones de la ley para tal caso hecha y prevista, el demandado, como Tesorero de Puerto Rico, tasó la propiedad del demandante para el año económico que empieza el primer día de julio de 1913 y termina el treinta de junio de 1914. Que para los fines de tasación el expresado demandado, obrando bajo las disposiciones de dicha ley, exigió y solicitó del demandante le suministrase un estado bajo juramento abarcando todas las propiedades poseídas por el demandante en la Isla de Puerto Rico, especificando su verdadero y efectivo valor. Que el demandante para cumplir con dicha exigencia y demanda, suministró al Tesorero de Puerto Rico un estado bajo juramento respecto a sus propiedades reales y personales, especificando el verdadero y efectivo valor de las mismas, cuyo estado

fué aceptado y considerado por el demandado, como Tesorero de Puerto Rico.

"6. Que una gran parte del negocio del demandante consiste en moler cañas y extraerles el jugo, convirtiendo el jugo de dichas cañas cultivadas en Puerto Rico en azúcar centrífuga y primera. Que con tal fin ha construído sobre su propiedad real en dicho distrito municipal de Guánica una factoría de azúcar completamente equipada para moler cañas y extraerles el jugo y convertir éste en azúcar.

"7. Que una lista completa de toda la maquinaria y otros aparatos, útiles y accesorios empleados en dicha fábrica y el verdadero valor de los mismos fué dado a dicho demandado, como Tesorero de Puerto Rico, a petición y demanda hecha por éste, en una planilla impresa suministrada por el demandante al demandado y conocida y designada como '*Exhibit* 5, Factoría de Azúcar,' al contenido de la cual nos remitimos. Que este *exhibit* es parte del estado jurado a que nos referimos anteriormente y el demandante alega que es un verdadero, completo, correcto y cabal inventario de la maquinaria, equipo, útiles y accesorios de dicha factoría de azúcar y contiene una tasación verdadera, correcta y completa del verdadero valor de todas y cada una de las partes componentes de dicha factoría. Y el demandante alega que el valor así fijado a dicha factoría en el tiempo en que se le suministró la tal planilla denominada más particularmente '*Exhibit* 5, Factoría de Azúcar,' era el verdadero valor entonces y en el tiempo en que se hizo la tasación de la propiedad del demandante que anteriormente y más adelante se mencionan.

"8. Que no se obtuvo ninguna otra información, ni se hizo otro examen, ni tampoco se empleó otro medio de averiguar el verdadero valor de la factoría del demandante por el demandado, como Tesorero de Puerto Rico o por los tasadores o sub-tasadores nombrados con el fin de ayudar a dicho demandado en la referida tasación, a no ser el examen hecho por ellos de dicho '*Exhibit* 5, Factoría de Azúcar' y la tabla de tasación a que nos referiremos más adelante.

"9. Que posteriormente, durante el mes de agosto de 1913, dicho demandado como Tesorero de Puerto Rico, alegando que obraba por y en virtud de la ley para tal caso hecha y prevista, impuso contribución al demandante por concepto de su factoría sobre una tasación de $1,800,000, y posteriormente, allá para el día 29 de agosto de 1913, el demandante recibió un aviso de la expresada tasación junto con otros, al contenido de cuyo aviso nos remitimos.

"10. Que al recibo de tal aviso y en tiempo propio el demandante notificó debidamente a la Junta de Revisión e Igualamiento, según

lo exige la ley, su protesta contra tal tasación, al contenido de cuya protesta nos remitimos.   Que como puede verse tanto en el aviso de tasación ·como en la protesta se incluía dicha factoría ·de azúcar de la propiedad del demandante.

"11. Que la tasación fijada por el demandante sobre las partidas mencionadas en el referido *'Exhibit* 5, Factoría de Azúcar' fué $1,203,891, siendo aproximadamente $600,000 menos que la tasación fijada por el ·demandado, como Tesorero de Puerto Rico, para los fines de contribución.   Que el demandante por medio de uno de sus oficiales autorizados requirió al demandado para que le informase qué partidas había aumentado en dicho *'Exhibit* 5, Factoría de Azúcar,' a fin de poder determinar los puntos de diferencia entre dichas tasaciones y estar en condiciones de poder discutir el asunto ante la Junta de Revisión e Igualamiento.   Que dicho demandado, como Tesorero de Puerto Rico, por conducto de la persona que entonces actuaba como Tesorero de Puerto Rico, interino, en ausencia del demandado, rehusó suministrar dicha información, manifestando que la tasación de la factoría fué fijada en globo. .

"12. Que la Junta de Revisión e Igualamiento oyó la protesta del demandante, en cuya vista el demandante estuvo representado por un oficial autorizado, y posteriormente, en una fecha desconocida para el demandante, la Junta de Revisión e Igualamiento resolvió la protesta del demandante y confirmó la tasación de la factoría del demandante en $1,800,000.

"13. Que posteriormente y allá para el 17 de abril de 1914 el demandante recibió un aviso, al contenido del cual nos remitimos, cuyo aviso, firmado por el demandado como Presidente de la Junta de Revisión e Igualamiento parece representar la verdadera tasación de la propiedad del demandante según se ha fijado por la Junta de Revisión e Igualamiento, y sobre cuya tasación tuvo el demandante que pagar contribuciones.

"14. Que posteriormente y allá para el día ·27 de abril de 1914, o antes, el demandante recibió un aviso del demandado, como Tesorero de Puerto Rico, enviado por un tal M. J. Harrison, Colector de Rentas, en el cual le informaba el importe de las contribuciones impuéstasle como resultado de tal tasación, para el año económico de 1913-14, y la suma allí mencionada era la de $28,380.10, cuya cantidad es el importe de la contribución sobre la propiedad real y personal del demandante en la Isla de Puerto Rico, calculada a razón de 1.2 por ciento por año sobre la tasación de la factoría de azúcar anteriormente descrita de $1,800,000, a saber, la suma de $21,800.

"15. Que dichas contribuciones se adeudaban y debían pagarse inmediatamente y que en cuanto a todas las cantidades no satisfechas antes del primero de junio de 1914 se impondría una penalidad de un recargo mensual del 1 por ciento por cada mes que transcurriese sin hacerse el pago y que el Tesorero de Puerto Rico, obrando en virtud de acuerdo con la ley para tal caso hecha y prevista, y por conducto de sus propios agentes y auxiliares, amenazó embargar la propiedad del demandante si no se pagaban las contribuciones, por lo que el demandante, allá para el día 28 de abril de 1914, pagó dichas contribuciones bajo protesta de acuerdo con las disposiciones de la ley de marzo 9 de 1911, por medio de un cheque a la orden del Tesorero de Puerto Rico, cheque que se había endosado 'Pago bajo protesta y de acuerdo con la ley de marzo 9 de 1911'' y que fué remitido con una carta fechada abril 26 de 1914, expresando los fundamentos de la protesta, a los términos de cuya carta nos remitimos.

"16. Que la tasación de $1,800,000 de la factoría de azúcar del demandante es exagerada y excesiva y no representa el verdadero valor de dicha propiedad y que el verdadero y correcto valor de la factoría de azúcar es la cantidad de $1,203,891. Que la valoración verdadera y correcta es la que se da en el '*Exibit* 5, Factoría de Azúcar y que dicho *exhibit* era la única fuente legal de información en cuanto al valor real en Puerto Rico de la expresada factoría, maquinaria, útiles y accesorios en la fecha en que se hizo la tasación por el demandado y en la fecha en que se revisó dicha tasación por la Junta de Revisión e Igualamiento.

"17. Que el demandado, como Tesorero de Puerto Rico, y dicha Junta de Revisión e Igualamiento adoptaron un método ilegal, nulo, injusto y que establece discrimen al fijar la tasación de la factoría del demandante y al imponer la contribución sobre la base de tal tasación. Que el método de tasación e imposición a que nos referimos es el siguiente:

"El demandado como Tesorero de Puerto Rico, mandó preparar una tarifa o tabla de tasación en la que colocó ciertos números, representando éstos el supuesto valor de las factorías de azúcar de ciertas corporaciones, que poseen y explotan factorías de azúcar en la Isla de Puerto Rico, siendo veintitrés aproximadamente el número de aquéllas. Hizo también que se pusiesen números demostrando las tasaciones anteriores de las referidas factorías y un cálculo del costo de las varias partes de la maquinaria, incluyendo calderas, centrífugas, clarificadoras, tachos al vacío y otros implementos y accesorios. Y el total de estos números representando el supuesto

costo de dicha maquinaria de cada factoría se dividía por el número
de toneladas de cañas capaz de ser molidas diariamente y los núme-
ros así obtenidos en cada factoría se sumaban y el resultado se divide
por el promedio obtenido entre el número de factorías, formándose
así junto con los otros elementos, tales como el transporte, cons-
trucción y entretenimiento, un supuesto promedio del costo de maqui-
naria de azúcar por tonelada por día.   El tipo de unidad o promedio
obtenido fué el de $500 aproximadamente.

"Que sobre este tipo o base de unidad o promedio la referida
factoría de azúcar del demandante con su capacidad de 3,700 tone-
ladas por día tendría un valor de $1,850,000, pero debido a condicio-
nes de sequía y a otros elementos, y para fijar la tasación en un
número redondo se rebajó a $1,800,000.

"19. Que esta supuesta unidad no es por ningún concepto un
verdadero y correcto criterio del valor de algunas de las factorías
de azúcar de Puerto Rico y mucho menos tratándose de la factoría
de azúcar del demandante; que la capacidad de la factoría del de-
mandante es cerca de dos veces la de la factoría mayor de la isla,
y es cerca de cinco o seis veces mayor que la de las otras factorías;
que el costo de la maquinaria para la factoría del demandante es
muy distinto de aquel de las otras factorías de la isla y que al adoptar
una unidad o tipo tan grande para la tasación el resultado obtenido
es una valoración errónea e incorrecta, siendo la tasación contraria
a la Constitución de los Estados Unidos y a las Enmiendas Cuarta
y Quinta de la misma, y a la Ley del Congreso de los Estados Unidos
aprobada abril 12 de 1900, titulada 'Ley para proveer temporalmente
de rentas y un gobierno civil a la Isla de Puerto Rico y para otros
fines' las que disponen que se impondrán y cobrarán contribuciones
sobre el valor de las propiedades sujetas a contribución.

"20. Que la tasación así hecha por el demandado y por la
Junta de Revisión e Igualamiento, no sólo es excesiva en cuanto a
la factoría del demandante, sino que es posible construir una factoría
nueva completamente acabada, parecida en diseño pero superior en
capacidad productiva a la factoría que ahora está en explotación,
incluyendo el costo de transporte, construcción y entretenimiento,
por una cantidad mucho menor que $1,800,000.

"21. Que la diferencia entre el valor de la factoría del demandante
según fué tasada, a saber, $1,800,000, y el verdadero y efectivo
valor de la misma de $1,203,891 es de $596,109.   Y que la contribución
sobre esa suma al tipo del 1.2 por ciento por año asciende a $7,153.31,

cuya contribución se ha pagado bajo protesta por las razones que anteriormente se mencionan.

La súplica que se hace en la demanda es que se certifique de acuerdo con las constancias del caso "que la tasación que excedió de $1,203,891, es excesiva e ilegal y que la cantidad de $7,153.91 fué indebidamente pagada y debe ser reintegrada y que se dicte sentencia ordenando al Tesorero de Puerto Rico a reintegrar dicha suma, debiendo verificarse ese pago con preferencia a cualquiera otra reclamación contra el Tesoro.

La corte sentenciadora resolviendo la excepción previa interpuesta a la demanda, declaró que los hechos aducidos en dicha demanda no constituían una causa de acción y desestimó la demanda.

No fué emitida ninguna opinión en la corte inferior, pero el apelado trata de sostener la sentencia por medio de un razonamiento extenso en apoyo de las siguientes proposiciones:

"I. Una valoración fijada por la Junta de Revisión no puede ser atacada judicialmente por el fundamento de que sea excesiva.

"1. No procede una acción en derecho para recobrar el importe de contribuciones que se alegan no se adeudan debido a exceso de tasación.

"2. En un pleito por el Gobierno para cobrar contribuciones el exceso de la tasación no puede alegarse como una defensa completa o parcial.

"3. El hecho de que la Junta de Revisión e Igualamiento haya hecho una tasación excesiva no justifica motivos para un *injunction* tendente a impedir el cobro de las contribuciones.

"4. No procede un auto de *certiorari* u otro recurso extraordinario para atacar una excesiva tasación.

"5. Lo definitivo de las resoluciones de la junta, en cuanto a los asuntos de tasación, está basado sobre principios de legislación gubernamental completamente aceptados.

"II. Aun cuando la tasación se haya alcanzado por la adopción de principios erróneos de carácter económico, no puede ser alterada. Una regla no deja de ser legal porque no sea económicamente perfecta.

"III. La demanda no establece que el criterio adoptado por la

junta sea económico o legalmente erróneo, ni que fuese erróneamente aplicado al molino de la demandante.

"IV. No puede confiarse en la excesiva valoración fijada por la junta para iniciar un pleito bajo la Ley de marzo 9 de 1911.

"V. La demanda no establece que el molino ha sido tasado en menos de su valor sujeto a contribución como propiedad."

Haremos una ligera referencia a las autoridades en que se funda principalmente el apelado.

En el caso de *Supervisors v. Stanley,* 105 U. S. 305, 15 Fed. 483, 121 U. S. 535,

"Staley obtuvo una sentencia contra la Junta de Supervisores del Condado de Albany, por contribuciones exigidas y pagadas mediante procedimientos legales sobre acciones de capital de la National Albany Exchange Bank. Un gran número de los accionistas del banco que habían pagado esta contribución hizo cesión de sus reclamaciones a Stanley, y la sentencia se dictó por la suma de $61,991.20, con intereses y costas.

"El fundamento de esta sentencia fué el de que el estatuto de New York por virtud del cual las acciones fueron tasadas, era nulo, perque no permitía al accionista hacer deducción de la suma de sus deudas de la valoración de sus acciones de capital, al determinar la suma por la cual debían pagar contribuciones."

En la segunda apelación la Corte Suprema hablando por conducto del Juez Asociado Señor Field, se expresó en estos términos:

"Hombres inteligentes constantemente difieren en el cálculo que hacen del valor de tal propiedad, y el mercado de acciones demuestra que se verifican cambios casi diariamente. Es de presumirse que el valor nominal es el verdadero valor, y cualquier aumento por ganancias va según el curso natural de las cosas en forma de dividendos a los accionistas. Este método aplicado a todos los bancos, nacionales y de Estado, es la manera más práctica, considerando la naturaleza de la propiedad, de asegurar en lo que a ellos respecta, la uniformidad e igualdad de la contribución; no puede ser considerado como que establece privilegios contra uno u otro. Ambos están colocados al mismo nivel. En *Mercantile Nationel Bank of New York* v. *The State of New York,* 120, U. S. 138, 155, resuelto recientemente, esta corte se expresó como sigue: 'El objeto principal, por consiguiente,

del Congreso, al fijar límites a la contribución del estado sobre inversiones en las acciones de bancos nacionales era hacer que fuera imposible para el estado al fijar tal contribución, establecer y fomentar una competencia desfavorable y desigual, favoreciendo a individuos e instituciones que realizan operaciones y negocios semejantes e inversiones de igual carácter. El texto de la ley del Congreso debe ser leído a la luz de esta práctica.'

"El método seguido no podía en manera alguna ser considerado como adoptado en pugna con los bancos nacionales. Tiene que colocar a veces el valor calculado de sus acciones bajo su verdadero valor; pero tal resultado no es uno del que pueden quejarse los tenedores de acciones del banco nacional. A veces también conduce a dar un valor mayor a las acciones; pero si es así no hay base para recobrar las contribuciones que han sido cobradas sobre las mismas. Es únicamente cuando la tasación es enteramente nula o nula en lo que respecta a porciones separables de la propiedad, que la suma cobrada que puede ser determinada, o cuando la tasación ha sido anulada como inválida, que una acción de acuerdo con la ley procederá para las contribuciones que han sido satisfechas o para una parte de las mismas. El fijar un valor mayor a la propiedad no constituye un fundamento de acción de acuerdo con la ley, para reclamar el exceso de contribuciones pagadas con excepción de lo que debió haberse fijado por virtud de una justa valoración. Las cortes no pueden en tales casos asumir las funciones de una junta de revisión o igualamiento. *Newman* v. *Supervisors*, 45 N. Y. 676, 687; *National Bank of Chemung* v. *Elmira*, 53 N. Y. 49, 52; *Bruecher* v. *The Village of Portchester*, 101 N. Y. 240, 244; *Lincoln* v. *Worcester*, 8 Cush. 55, 63; *Hicks* v. *Westport*, 130 Mass. 478; *Balfour* v. *City of Portland*, 28 Fed. Rep. 738.

"En casi todos los Estados, probablemente en todos, la ley dispone lo necesario para la corrección de errores e irregularidades de los tasadores en la tasación de la propiedad para fines de contribución. Esto generalmente se hace por medio de juntas de revisión o igualamiento como a menudo se les llama, concediéndose a veces un derecho de apelación contra sus decisiones, a las cortes de justicia. Son establecidas estas juntas para llevar a cabo la regla general de igualdad y uniformidad de la contribución como lo exigen los preceptos constitucionales o estatutorios. La igualdad y uniformidad absoluta raras veces pueden conseguirse. La diversidad de criterios humanos y la incertidumbre que acompaña a toda la prueba humana, excluyen la posibilidad de que pueda alcanzarse este fin. Hombres inteligentes difieren en lo que respecta al valor hasta de los objetos más comunes

ante ellos—de animales, casas y terrenos, en uso constante.   Todo lo
más que puede esperarse de una legislación sabia es una aproximación
a este fin que se desea; y el requisito de la igualdad y uniformidad
que aparece en las constituciones de algunos de los Estados, queda cumplido cuando pueden evitarse las desviaciones manifiestas de la regla.

"A estas juntas de revisión cualquiera que sea el nombre por el
cual se les llame, el ciudadano debe acudir en busca de un remedio
contra la tasación excesiva e irregular, cuando los funcionarios tasadores tenían jurisdicción para tasar la propiedad.   Su acción es judicial por su naturaleza.   Resuelven sobre el valor de la propiedad mediante un examen personal así como de la prueba relativa a la misma.
Siendo su acción judicial, su criterio en casos comprendidos en su
jurisdicción no está sujeto a ser atacado colateralmente.   De no ser
corregido por alguno de los medios señalados por el estatuto, tal criterio es concluyente, cualesquiera que hayan sido los errores cometidos
en la tasación.   Como se dijo en uno de los casos que han sido citados,
el dinero cobrado por virtud de tal tasación no puede ser recuperado
en una acción legal como no lo sería el dinero cobrado por virtud de
una sentencia errónea de una corte de jurisdicción competente antes
de que ésta fuera revocada."

*Maish* v. *Arizona,* 164 U. S. 599, fué una acción para recobrar contribuciones vencidas y no satisfechas de acuerdo con
un estatuto de Arizona.   La opinión, que fué emitida por el
Juez Asociado Sr. Brewer, empieza y concluye como sigue:

"El estatuto, como se verá, autoriza a toda persona interesada en
cualquiera propiedad, a defenderse contra las contribuciones que han
tratado de ser fijadas a la misma 'especificando por escrito el motivo
particular de oposición,' y exige que la corte, cuando se haga tal defensa 'oiga y resuelva la cuestión en forma sumaria sin alegaciones,' y
'dicte sentencia, según sea el derecho del caso.'   También prescribe
el estatuto que la lista o relación de contribuciones morosas constituye prueba *prima facie* de que las contribuciones que en ella aparecen
son debidas por la propiedad.'

    *       *       *       *       *       *       *

"La objeción final que se hace es que la tasación era excesivamente injusta y que hubo un privilegio fraudulento a favor de la Southern
Pacific Railroad Company.   Aparece que la tasación del ganado de
clase corriente fué fijada por la junta territorial en $7.42, mientras que
un testigo declaró que su valor era de $6 ó $6.50 por cabeza.   Tam-

bién aparece que la junta territorial valoró la propiedad del ferrocarril en $6,811.14 por milla, no obstante haber habido prueba de que el duplicar el cimiento y la vía solamente costaría de $21,000 a $22,000 por milla; y los apelantes ofrecieron probar que la compañía de ferrocarril manifestó a la junta que si la valoración se fijaba en más o menos el tipo en que había sido fijada pagaría las contribuciones; y de ser mucho más alta se opondría al cobro en las cortes; y que la junta resolvió que era mejor obtener algunas contribuciones de la compañía de ferrocarril que no ningunas, y por tanto fijó la valoración en la suma especificada.

''No existe nada tendente a demostrar que la junta al fijar el valor del ganado en $7.42 procedió fraudulentamente o con alguna intención dañosa o que esa valoración no era el resultado de su deliberado criterio basado en una causa suficiente y después de haber tenido en cuenta prueba bastante, y sería raro a la verdad que pudiera anularse una tasación por el hecho de que aparezca un sólo testigo que declara que la valoración era excesiva. No podría sostenerse ninguna tasación si ésta dependía del hecho de que todas las partes creyeron que la valoración fijada por la junta de tasación era correcta. Algo más que un error de criterio debe demostrarse, algo que indique fraude o mala conducta. Ni tampoco el hecho de que un funcionario de la compañía de ferrocarril se presentó ante la junta y manifestó su deseo de pagar las contribuciones sobre cierta valoración y su intención de oponerse al pago de contribuciones sobre cualquier valoración más alta, es suficiente para imputar conducta fraudulenta a la junta, aunque ésta finalmente fijara la valoración en la suma especificada por la compañía de ferrocarriles. Aparece de la declaración de uno de los miembros de la junta de igualamiento que ésta se guió en gran parte por la valoración fijada en otros estados y territorios a la propiedad de ferrocarriles y que de tal valoración así como de la que presenta la compañía de ferrocarriles, la junta hizo una tasación en algo así como el promedio de la valoración de los ferrocarriles de varios estados y territorios nombrados. Es innecesario resolver si esta junta cometió error en su decisión, en lo que respecta al valor de esta propiedad, o si no hubiera sido mejor haber procedido a verificar otro examen y haber oído más declaraciones en cuanto al costo de construcción, condiciones actuales, etc. Questiones de esta clase generalmente quedan sometidas en gran parte a la discreción y criterio de la junta de tasación e igualamiento y si ésta ha procedido de buena fe su criterio no puede ser anulado. *Pittsburgh, Cincinnati etc., Railway* v. *Backus,* 154 U. S. 421-435.''

Hacemos la siguiente cita de la opinión del Juez Sr. Holmes en el caso de *Chicago, B. & Q. Ry. Co.* v. *Babcock,* 204 U. S. 585:

"Estas son peticiones para que se declaren nulas las tasaciones de contribuciones hechas por la Junta de Igualamiento y Tasación del Estado para el año 1904, e impedir el cobro de dichas tasaciones en exceso de ciertas sumas que fueron presentadas para su pago. Alegan las peticiones que la junta, coaccionada por el clamor político y sus temores, arbitrariamente resolvió por adelantado agregar alrededor de unos $19,000,000 a la tasación de la propiedad de ferrocarriles del año anterior, y entonces pretendió fijar los valores de los varios ferrocarriles mediante un cálculo. Alegan las referidas peticiones que las tasaciones fueron fraudulentas, y nulas por falta de jurisdicción, y justifican estas alegaciones generales mediante manifestaciones más específicas.    *    *    *

"El propósito predominante de estas peticiones es imputar presión política, por así decirlo, y un consiguiente proyecto de fraude demostrado por los daños específicos que han sido alegados, y de ese modo llegar a la conclusión de que las contribuciones eran nulas. Como los casos proceden de la Corte de Circuito pueden levantarse otras cuestiones además de la suscitada bajo la Constitución, y por tanto procede decirse al empezar que el fundamento de las peticiones ha fracasado. Se insiste en uno de los alegatos escritos en que hubo coacción política, cuestión que fué resuelta por las conclusiones del juez sentenciador, y que no hay razón suficiente para modificarlas. La alegación de fraude, aunque hubiera sido alegada debidamente, *Missouri* v. *Dockery,* 191 U. S. 165, 170, fué hecha muy levemente en el argumento, y no ha sido probada en absoluto por los hechos. Tales cargos pueden ser hechos fácilmente y lo que debe temerse, a menudo se hacen sin tener en cuenta la responsabilidad en que se incurre con ellos.    *    *    *

"Cuando pasamos a la prueba, vemos que hay igual motivo de censura. Los miembros de la junta fueron convocados incluyendo el Gobernador del Estado, y sometidos a un examen detenido de repreguntas en relación con el procedimiento mental seguido por ellos al valorar e imponer las contribuciones a las compañías. Esto era enteramente impropio. En este particular el caso no se diferencia de aquel de un jurado o un árbitro, si damos por sentado que los miembros de la junta no tenían derecho a las inmunidades que posiblemente tiene un juez. *Duke of Buccleuch* v. *Metropolitan Board of Works,*

L. R. 5 H. L. 418, 457, 462. Igual razonamiento fué aplicado a un juez en el caso de *Fayerweather* v. *Ritch,* 195 U. S. 276, 306, 307. Una multitud de casos podrán encontrarse recopilados en 4 Wigmore on Evidence, secciones 2348, 2349. Todas las muy repetidas razones referentes a la regla relativa a jurados son de aplicación con doble fuerza a la tentativa, demostrando en el examen de repreguntas la confusión mental de los miembros, para atacar en otro procedimiento la sentencia de un tribunal cuyos miembros no son abogados, cuya razón en tanto sea posible, tiene por objeto ser final, sin tener en cuenta los errores de hecho y de derecho. Véase *Coulter* v. *Louisville & Nashville R. R. Co.,* 196 U. S. 599, 610; *Central Pacific R. R. Co.* v. *California,* 162 U. S. 91, 107, 108, 117; S. C. 105 California, 576, 594; State Railroad Tax cases, 92 U. S. 575; *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* v. *Backus,* 133 Indiana, 513, 542. En *Fargo* v. *Hart,* 193 U. S. 490, 496, 497, no hubo verdadera cuestión en cuanto al principio adoptado.

"Además, esta junta necesariamente conservaba y evidentemente era de esperarse, de acuerdo con los estatutos, que tenía un registro. Esa era la mejor prueba al menos, de sus decisiones y actos. Si las compañías hubieran deseado una resolución expresa de la junta sobre las deducciones que ellas solicitaban pudieron haberla pedido y haber solicitado también que la resolución de la junta o su negativa a actuar fuera anotada en el registro. Habría tiempo suficiente para presentar otra prueba cuando tal petición hubiera sido hecha y denegada. Véase *Fargo* v. *Hart,* 193 U. S. 490, 498; *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* v. *Backus,* 133 Indiana, 513, 542; *Havemeyer* v. *Board of Review,* 202 Illinois, 446. * * *

"La Junta manifiesta su resultado en otro voto. 'Habiendo prestado amplia y debida consideración a los informes suministrados a dicha junta por las varias compañías de ferrocarriles, y habiendo tomado en consideración la vía principal, desvíos, vías secundarias, vías que entran en casas de almacén, cimientos, derechos de paso, terrenos de estaciones, y todas las estaciones para agua y combustibles, edificios y fábricas de las mismas, y toda la maquinaria, material rodante, líneas telegráficas e instrumentos conectados con las mismas, todo el material a mano y efectos, dineros, créditos, franquicias y toda otra propiedad de dichas compañías de ferrocarriles, y habiendo tomado en consideración las ganancias en bruto y netas de dichas compañías, la suma total empleada en su funcionamiento y sostenimiento, los dividendos pagados, el capital social de cada sistema o compañía, y el valor en el mercado del mismo, y la suma total

de las deudas garantizadas y no garantizadas (nosotros) por la presente imponemos y fijamos para los fines de la contribución el valor total actual, el promedio del valor por milla y el valor que puede ser tasado por milla de las varias compañías, como sigue:' con una lista * * *

·''Evidentemente que la junta creyó que las cifras suministradas por las compañías eran demasiado favorables y pretendían mantener las contribuciones tan bajas como pudieran ser mantenidas. Evidentemente también que los miembros o algunos de ellos se valieron de su propio criterio y de su propio conocimiento, del que no podrán dar muy buena cuenta en el examen de repreguntas, pero el cual tenían derecho a poner en ejercicio, de ser honrados, por desconectadas que sean las premisas. Parece, teniendo en cuenta la prueba como podría haberse esperado, que las valoraciones fijadas constituían un arreglo y se creía por algunos miembros que eran demasiado bajas, como parecían a otros demasiado altas. Se nos arguye mediante prueba pericial que son demasiado bajas. El resultado de la prueba manifiesta la infructuosidad de las preguntas, las que, como hemos dicho, no debieron haberse hecho en absoluto. Hemos llamado la atención más particularmente al caso de Union Pacific, pero el de Chicago, Burlington and Quincy Railroad, se basa en razones semejantes y no más fuertes, y lo que hemos dicho resuelve la alegación principal en ambos casos. Si la corte inferior hubiera declarado de otro modo hubiera sido difícil que la conclusión estuviera sostenida por prueba competente. Ciertamente que no hay razón suficiente para modificar la conclusión tal como está * * *.

''Varios argumentos se nos hicieron sobre cuestiones de detalle que no proporcionan razón para que intervenga la corte y que no creemos necesario exponer con extensión. Entre ellos está la manifestación relativa a arbitrariedad en diferentes cuestiones, tal como la distribución del valor total fijado a la Chicago, Burlington and Quincy, entre las diferentes compañías que la componen. Pero la acción no parece haber sido arbitraria menos en el sentido en que lo son muchos juicios honrados y sensatos. Expresan ellos una intuición de experiencia que sobrepasa todo análisis y resume muchas impresiones confusas y sin nombre; impresiones que pueden permanecer desconocidas sin perder por eso su valor. La junta fué creada con el objeto de poner en ejercicio su criterio y conocimiento. *State Railroad Tax Cases,* 92 U. S. 575; *State* v. *Savage,* 65 Nebraska, 714, 768, 769; *In re Cruger,* 84 N. Y. 619, 621; *San José Gas Co.* v. *January,* 57 California, 614, 616. Dentro de su jurisdicción, menos en lo que

hemos dicho, en caso de fraude o en el de verse claramente que se han observado principios perjudiciales, es el principal guardián de ciertos derechos. El estado ha confiado esos derechos a su protección, así como en su honor y capacidad, como confía la protección de otras relaciones sociales a las cortes de justicia. En alguna parte debe haber un fin. Somos de opinión que aun cuando se hayan notado motivos de incertidumbre, nada se ha probado de manera tan clara y palpable como debiera probarse, teniendo en cuenta el principio establecido en el caso de *San Diego Land & Town Co.* v. *National City,* 174 U. S. 739, 754, para que estén justificadas estas apelaciones a la jurisdicción extraordinaria de la Corte de Circuito.''

En el caso de *Hilton* v. *Merritt,* 110 U. S. 97, al cual hizo referencia el apelado como ''un caso interesante basado sobre una situación completamente análoga'' y ''prácticamente concluyente'' respecto a la cuestión que aquí se discute, la Corte Suprema después de citar el estatuto Federal envuelto, dice lo siguiente:

''Los preceptos del estatuto demuestran con qué cuidado el Congreso ha dispuesto que se haga una valoración razonable en mercancías importadas sujetas al pago de derechos, preceptos que también demuestran la intención del Congreso de hacer final y concluyente la valoración. Cuando se fija el valor de la mercancía por los funcionarios nombrados de acuerdo con la ley y los preceptos estatutorios para la apelación han sido agotados, el estatuto declara que la 'valoración así fijada será final y tenida como el valor verdadero, y los derechos serán impuestos a la misma de conformidad.' Este lenguaje parece no dar lugar a dudas o a interpretación de ninguna especie.

''La alegación de los apelantes es que después que la valoración de la mercancía ha sido hecha por el tasador ayudante y revisada por el tasador general y se ha registrado una protesta contra su acción por el importador, y el colector ha nombrado un tribunal especial compuesto de un tasador general y comercial, para fijar el valor, el que ha presentado una valoración diferente al colector, quien después ha dado su resolución y fijado la valoración sobre la cual debían ser impuestos los derechos, de que en cada uno de estos casos el importador tiene derecho a impugnar todavía más la tasación y hacer que sea revisada por un jurado en una acción legal para recobrar los derechos pagados. Después que el Congreso ha declarado que la tasación de los funcionarios de aduanas debe ser final para los fines

de fijar los derechos, el derecho del importador a exigir el veredicto de un jurado sobre la corrección de la valoración debe ser declarado en términos claros y expresos. Lejos de ser éste el caso, no vemos que el Congreso haya dado en manera alguna el derecho. Si en cada acción establecida para recobrar derechos pagados bajo protesta hubiera de permitírsele al jurado revisar la valoración hecha por los funcionarios de aduanas, el resultado sería una gran incertidumbre y desigualdad en el cobro de derechos sobre importaciones. Es casi posible que dos jurados no estarían de acuerdo sobre el valor de las diferentes facturas de las mismas mercancías. La legislación del Congreso a que hemos hecho referencia tenía por objeto según nos parece, excluir semejante método de determinar el valor de las mercancías sujeto al pago de derechos. Esta corte al hacer referencia a la práctica general de las leyes para el cobro de derechos, dijo en *Bartlett* v. *Kane,* 16 How. 263, 'La interposición de las cortes en la valoración de importaciones, envolvería el cobro de las rentas en una gran confusión.' Al hacer referencia al artículo 3 de la Ley de marzo 3, 1851, que ha sido reproducido en la sección 2930 de los Estatutos Revisados esta corte declaró en el caso de *Belcher* v. *Linn,* 24 How. 508, que, a falta de fraude, la decisión de los funcionarios de aduana 'es definitiva y concluyente, y su valoración, según la ley, se convierte para los fines del cálculo y tasación de los derechos debidos a los Estados Unidos, en el verdadero valor sujeto al cobro de derechos por importación.' En el mismo sentido se pronuncia *Tappan* v. *United States,* 2 Mason, 393, y *Bailey* v. *Goodrich,* 2 Cliff. 597.

"Los apelantes alegan sin embargo que el derecho a revisar la valoración de los funcionarios de aduana en un juicio por jurado se concede al importador por las secciones 2931 y 3011 de los Estatutos Revisados. La primera de dichas secciones dispone que al importar cualquier mercancía la decisión del colector en cuanto a la tarifa e importe de derechos será final y concluyente a menos que el importador dentro de los dos días después de la fijación y liquidación por los debidos funcionarios de aduana, dé aviso por escrito al colector en lo que respecta a cada importación, si no está conforme con su decisión, alegando distinta y específicamente los fundamentos de objeción que presenta, y dentro de treinta días después de tal fijación y liquidación interpondrá recurso de apelación al Secretario del Tesoro, y la resolución del secretario en tal apelación será final y concluyente, y dicha mercancía quedará sujeta al pago de derechos de conformidad, a menos que se establezca una acción dentro de los noventa días después de dicha decisión del Secretario del Tesoro.

El artículo 3011 dispone que cualquier persona que haya verificado el pago bajo protesta de cualquier cantidad de dinero como derechos cuando dicha suma por derechos no estaba autorizada por la ley, o no lo estaba por completo, puede sostener una acción, que será juzgada por jurado para determinar la validez de tal demanda y pago de derechos, y para recobrar cualquier exceso así pagado; pero no se permitirá recobrar nada en tal acción a menos que una protesta y apelación hayan sido interpuestas como lo prescribe la sección 2931.

"El argumento que se presenta es que por estas secciones la valoración que había sido declarada final por la sección 2930 está sujeta a ser revisada en un juicio por jurado. Tal no es en nuestra opinión una interpretación razonable de esta legislación. Considerando las leyes del Congreso como que por ellas se establece un sistema y dando efecto a todas las secciones, su significación clara y evidente es que la valoración de los funcionarios de aduanas será definitiva, pero todas las demás cuestiones relativas a la tarifa e importe de derechos puede, después que el importador ha tomado las debidas medidas, ser revisada, en una acción legal para recobrar derechos que han sido exigidos indebidamente. El tipo e importe de los derechos depende de la clasificación de la mercancía importada, esto es, de la lista a que pertenece. Frecuentemente surgen cuestiones relativas a si un artículo enumerado pertenece a una sección o a otra, y la sección 2499 de los Estatutos Revisados dispone que se impondrá en cada artículo que no ha sido enumerado y que tiene una semejanza ya en cuanto al material, calidad, textura, o el uso para el cual puede ser aplicado, a cualquier artículo enumerado al que pueden cobrársele derechos, la misma tarifa o derecho que se fija y carga al artículo enumerado que más se parece en cualquiera de los particulares descritos anteriormente. Al determinar el tipo y forma de derechos, el valor de la mercancía es un factor y la cuestión de bajo qué lista está comprendida, es otro.

"El Congreso ha dicho que la valoración de los funcionarios de aduana será final pero todavía queda lugar para la aplicación de las secciones en lo cual se fundan los apelantes. Las cuestiones relativas a la clasificación de importaciones y consiguientemente al tipo y suma de derechos están sujetas a ser revisadas en un procedimiento legal. Esta interpretación da efecto a ambos preceptos de la ley. Si nos sometemos a la alegación y a la interpretación de los apelantes debemos eliminar del estatuto la cláusula por la que se considera como final la valoración de mercancías sujetas a impuestos.

"Somos de opinión por tanto que la valoración hecha por los

funcionarios de aduana no estaba sujeta a ser discutida en una acción
legal mientras los funcionarios hubieran actuado sin fraude y dentro
de la facultad que les ha sido conferida por el estatuto   *   *   *.''

En el asunto de Baumgarten (N. Y. 1899) 39 App. Div.
174, la corte tenía bajo su consideración la sección 16 del capí-
tulo 686 de las leyes de 1892, que se cita enteramente en el
caso de *Ríos* v. *Richardson,* que acaba de fallarse.   La corte
resolvió que ''las contribuciones pagadas por el peticionario
no fueron fijadas ilegal o indebidamente'' de acuerdo con el
significado de esa sección, y entre otras cosas dijo lo que
sigue:

''La sección 16 del estatuto arriba citado se refiere a la 'corrección
de tasaciones y devolución y reintegro de contribuciones ilegales,'
y dicha sección autoriza 'el reintegro a cualquier persona, de la suma
cobrádale por cualquier contribución ilegal o impropiamente tasada
o fijada'; y me parece que se deduce concluyentemente que una con-
tribución legalmente tasada no puede ser ordenada su devolución
por la corte del condado.   Una contribución que ha sido legalmente
tasada por los funcionarios con jurisdicción no ha sido indebidamente
tasada.   En caso de que la propiedad de A haya sido desigualmente
tasada y a un tipo proporcional mayor que otra propiedad en el
distrito de tasación, no hay jurisdicción en la corte del condado para
corregir tal tasación desigual.   El remedio para tal tasación tiene
que buscarse de acuerdo con el artículo 250, capítulo 908, leyes de
1896, (5 R. S. [Banks' 9th ed.] 3309).   Pero en tal caso el remedio
tiene que solicitarse primeramente el día señalado para la presen-
tación de quejas.  No se alega que el peticionario compareciera al-
guna vez ante los tasadores de su distrito de tasación el día para
formular quejas y alegara que la totalidad o parte de sus bienes
inmuebles estaba exenta del pago de contribuciones por razón de haber
pagado la misma total o parcialmente, con dinero de pensión.''

Después de examinar un número de casos continúa la
opinión en estos términos:

'' 'Se dice que es una buena regla de interpretación que ''cuando
una ley del parlamento empieza con palabras que describen cosas o
personas de un grado inferior y termina con palabras generales, las
palabras generales no se harán extensivas a ninguna cosa o persona
de un grado superior;'' esto, es, ''cuando se habla de una clase en

particular y siguen palabras generales, la clase mencionada primeramente ha de tomarse como la más comprensiva, y las palabras generales serán consideradas como que se refieren a cuestiones *e jusdem generis* con tal clase.' '' (*Matter of Hermance*, 71 N. Y. 487.) (Para otros casos aclaratorios de esta regla, véase a Endlich Interp. Stat. secciones 186, 405, 411, y casos allí citados.)

"La sección 16 se refiere a la corrección de errores materiales manifiestos u otros errores cometidos en la tasación. El mismo lenguaje fué usado en la ley de 1871, y se resolvió en *Matter of Hermance*, (*supra*), que este lenguaje no incluía los errores de los tasadores al hacer la tasación, teniendo ellos jurisdicción, sino que estaba limitado a la tasación o informe presentado a la junta de supervisores. La solicitud en el caso de autos no era para corregir las tasaciones, sino para obligar a la devolución de contribuciones ilegal o indebidamente tasadas. La primera línea de la sección limitaba su alcance a la devolución de 'contribuciones ilegales,' y la palabra 'indebidamente' usada en la parte principal de esta sección no extiende, como ya se ha dicho, el efecto de la palabra en particular ilegalmente.' A la palabra 'indebidamente' en este estatuto no puede dársele su significación amplia y general—inconveniente, impropia o inadecuadamente—sino que debe estar restringida en su significación por la palabra particular que precede, 'ilegalmente.' ''

Hardin, P. J., al emitir su voto concurrente, dijo:

"Con anterioridad a la aprobación de la sección 16 a que se ha hecho referencia anteriormente, la parte sustancial de esa ley aparecía en el capítulo 685 de las leyes de 1871 que fueron interpretadas en *People ex rel. Pells* v. *Supervisors*, (65 N. Y. 300), y en la resolución del caso hubo empate. En ese caso la corte del condado dictó una orden disponiendo que el demandado devolviera al peticionario una suma especificada en la petición 'demostrando que durante los años 1866, 1867 y 1868, su propiedad había sido tasada erróneamente por los tasadores de Kingston, fijándosele un valor mayor a sus bienes muebles.' (P. 301.) Se expidió un auto de *mandamus* para obligar a la junta de supervisores a respetar la orden dictada por el juez del condado, y el Término General revocó la orden concediendo el *mandamus* y el comisionado de apelaciones revocó la resolución del Término General, cuyo voto estuvo dividido y confirmó la orden del Término Especial, que disponía fuera expedido un *mandamus* para hacer cumplir la orden del juez del condado. Se hizo referencia a ese caso en *Matter of Hermance,* (71 N. Y. 481), y también al estatuto

bajo el cual fué decidido, habiéndose expresado el Juez Allen (p. 483): 'Las cortes ciertamente que no están en completa armonía, como se ve de un modo manifiesto de las decisiones publicadas. (*In re* Hudson City Savings Institutions, 5 Hun. 612; *In re* N. Y. Catholic Protectory, 8 id. 91; *In re* Farmers' National Bank, 1 N. Y. S. C. R. (T. & C.) 383; *People* v. *Supervisors of Ulster Co.*, 65 N. Y. 300, en que se revoca el mismo caso publicado; 63 Barb. 83).'

"En *Matter of Buffalo Mutual Gas Light Co.* (144 N. Y. 228) se hizo referencia a los mismos estatutos y se dijo por el Juez O'Brien al hablar del estatuto de 1892, lo que sigue: 'El estatuto es una revisión de estatutos existentes anteriormente sobre la misma materia y que frecuentemente habían sido enmendados y cambiados por la legislatura. (Leyes de 1869, capítulo 855, sección 5, leyes de 1871, capítulo 695; leyes de 1884, capítulo 141; leyes de 1885, capítulo 326.) La significación y aplicación de estas diferentes leyes ha sido de tiempo en tiempo materia de gran discusión en las cortes, y las decisiones no son enteramente armónicas. (*People ex rel.* v. *Supervisors of Ulster Co.*, 65 N. Y. 300; *Matter of Hermance*, 71 Id. 484; *Matter of Catholic Protectory*, 77 id. 342; *Williams* v. *Supervisors of Wayne Co.*, 78 id. 561.)' (Véanse también *Broderick* v. *City of Yonkers*, 22 App. Div. 448 [*second department*] resuelto por una votación dividida; *Lapolt* v. *Maltby*, 31 N. Y. Supp. 686; *Van Hise* v. *Board of Supervisors*, 21 Misc. Rep. 572.)"

Cualquier discusión que hagamos de estos casos para diferenciarlos parece ser innecesaria. Exceptuando la decisión en el caso *in re* Baumgarten, cuya exactitud o falacia no es importante, la pureza de la doctrina enunciada en cada una de las opiniones citadas, ya en abstracto o a la luz de los hechos que se consideran, está fuera de toda duda. Pero en ninguno de aquellos casos se presentó a la corte un estatuto o una acción que de algún modo se asemeje a nuestra ley de 1911 y al pleito que ahora está sometido a nuestra consideración. Esta no es ni una mera acción para recobrar dinero que se encuentra indebidamente en poder de otro (*assumpsit*), de la ley común, ni es un pleito que depende del establecimiento de algún título reconocido de jurisdicción en equidad, o fundada en que no existe un remedio adecuado en la ley. La ley de 1911 no tiene por objeto él recobro de con-

tribuciones que han sido pagadas bajo protesta solamente cuando la suma de dichas contribuciones "no fué, o no estaba enteramente autorizada por la ley. No existe ninguna referencia a "algún error material u otro cualquiera en ninguna tasación o planilla;" ni tampoco puede encontrarse en el título de la ley ninguna limitación en su alcance. La ley no dice que el contribuyente pagará bajo protesta dichas contribuciones según que considere él que son contrarias a cualquier estatuto, ilegales, o injustas. No aparece absolutamente nada de la faz del estatuto que justifique la deducción de que nuestra legislatura intentó usar la palabra "injusta" como sinónima de ilegal. Hay sobrada razón para creer que usó la disyuntiva deliberadamente. Y de una lectura cuidadosa de las palabras empleadas no resulta dudoso el sentido. *In disjunctivis sufficit alteram partem esse veram.* La restricción de palabras generales a cosas *ejusdem generis* no debe llevarse a tal extremo que las haga perder todo su significado.

"Esta regla solamente puede ser usada como una ayuda al determinar la intención legislativa y no con el objeto de regular la intención o de circunscribir la aplicación del estatuto a límites más estrechos de aquellos que tuvo presente el legislador. Dicha regla suministra un mero indicio a la mente judicial de que cuando aparece claramente que el legislador pensaba en determinada clase de personas u objetos, sus palabras de descripción más general no pueden haber tenido la intención de comprender ningunas otras que las comprendidas dentro de la clase. La indicación es una de sentido común. Otras reglas de interpretación son asimismo poderosas, especialmente la regla principal que sugiere que la intención de la legislatura ha de encontrarse en la significación de las palabras del estatuto. El sentido en que las palabras generales o cualesquiera palabras han tratado de ser usadas facilita la regla de interpretación y esto ha de deducirse del contexto; y se dará una significación más restringida o más extensa, según que así aparezca de la intención. Para negar a cualquier palabra o frase su significación conocida y natural en cualquier caso, las cortes deben estar muy seguras de que observan la intención de la legislatura. Por tanto, aunque un término general vaya después de palabras específicas, no estará restringido por ellas cuando el

objeto de la ley y la intención sea que la palabra general sea inter-
pretada en su sentido ordinario." Sutherland on Statutory Con-
struction, section 279, páginas 361 et seq.

"La máxima *noscitur a sociis* no es una regla de interpretación
por la cual la significación de una palabra o expresión, o la de varias,
usadas en íntima relación, regule la determinación de la significación
de otras palabras o expresiones usadas en igual relación. Ud. puede
conocer a una persona por aquellas con quienes anda. Ud. puede cono-
cer la significación de un término por los que están relacionados con el
mismo—el que le precede y el que le sigue. ¿Cuándo? No en todos
los casos, sino cuando no resulte aparente del mismo lenguaje. Es
una regla de interpretación a que debe acudirse cuando hay motivo
para interpretación, y no en otro caso." *Brown v. Chicago & North-
western R. Co.* 44 L. R. A. 579.

"No tenemos facultad para interpretar cualquier estatuto de modo
que le neguemos efecto a cualquier parte del lenguaje expresado
en el mismo. Es una regla cardinal de interpretación estatutoria,
que se dará una significación y efecto siempre que sea posible a cada
palabra. Ya para la remota fecha del Compendio de Bacon, sección
2, se dijo: 'un estatuto debe en conjunto ser interpretado de tal
modo que si puede evitarse no resulte superflua, nula o insignificante,
ninguna cláusula, sentencia o palabra.' Esta regla ha sido repetida
innumerables veces. Otra regla igualmente reconocida es la de que
cada parte de un estatuto tiene que ser interpretada en relación con
su conjunto de manera que todas las partes sean armoniosas, de ser
posible, debiendo dársele significación a cada una." *Market Co.* v.
*Hoffman,* 101 U. S. 112.

"Para llegar al pensamiento o significado contenido en un estatuto,
un contrato o una constitución, debe acudirse en primer término en
todos los casos a la significación natural de las palabras según el
orden gramatical en que han sido colocadas por los que prepararon
el contrato. Si las palabras tienen una significación definida que
no envuelve un absurdo ni contradicción con otras partes del instru-
mento, entonces esa significación que aparece de la faz del instrumento
debe ser aceptada y ni las cortes ni las legislaturas tienen el derecho
de agregar o quitar nada a las mismas. *Newell* v. *People,* 7 N. Y. 9,
97; *Hills* v. *Chicago,* 60 Illinois, 86; *Dens* v. *Reid,* 10 Pet. 524;
*Leonard* v. *Wiseman,* 31 Maryland, 201, 204; *People* v. *Potter,* 47
N. Y. 375; Cooley Const. Limt. 57; Story on Const., sección 400;
*Beardstown* v. *Virginia,* 76 Illinois, 34. Así también cuando una
ley ha sido expresada en términos claros y que no son ambiguos ya

que dichos términos sean generales o restringidos, debe entenderse que la legislatura quiso expresar claramente lo que ella expresamente indica, y por consiguiente no hay lugar a interpretación. *United States* v. *Fischer,* 2 Cranch, 358, 399; *Doggert* v. *Florida Railroad,* 99 U. S. 72." *Lake County* v. *Rollins,* 130, U. S. 662.

"La regla general ha sido perfectamente establecida de que cuando un estatuto es de significación dudosa y susceptible según su faz de dos interpretaciones, la corte puede examinar las leyes anteriores y contemporáneas, las razones que tuvo en cuenta la ley en cuestión, los males que se pretendieron remediar, las circunstancias extrañas, y el objeto que se trató de alegar, para determinar su verdadera interpretación. Pero cuando la ley es clara según su faz y cuando, examinada separadamente, es razonablemente susceptible de una sola interpretación, debe dársele esa interpretación. Heydon's case, 3 Fed. Rep. 76; *United States* v. *Freeman,* 3 How. 556; *Smythe* v. *Fiske,* 23 Wall. 374; *Platt* v. *Union Pacific Railroad Co.,* 99 U. S. 48; *Thornley* v. *United States,* 113 U. S. 310; *Viterbo* v. *Friedlander,* 120 U. S. 707, 724; *Lake County* v. *Rollins,* 130 U. S. 662; *United States* v. *Goldenberg,* 168 U. S. 95. * * *.

"En verdad los casos son tan numerosos en esta corte en el sentido de que la facultad de interpretación descansa enteramente dentro del dominio de la ambigüedad, que es innecesaria una revisión extensa de los mismos. Toda la doctrina aplicable a la materia puede ser resumida en la sencilla observación de que puede acudirse a las leyes anteriores para *resolver* pero no para *establecer* una ambigüedad. Si la sección 728 fuera una ley original, no habría lugar para interpretación. Es solamente cuando se busca la ayuda de una ley anterior que puede ser posible que aparezca una duda en cuanto a su debida interpretación." *Hamilton* v. *Rathbone,* 175 U. S. 414.

"Cualquiera que sea el motivo, el lenguaje expresado indica claramente la intención legislativa y no deja dudas en cuanto a su significación. Siendo esto así, corresponde únicamente a las cortes hacer cumplir el estatuto de acuerdo con sus términos. *Lake County* v. *Rollins,* 130 U. S. 662, 670; *United States* v. *Lexington Mill Co.,* 232 U. S. 399, 409." *Texas Cement Co.* v. *McCord,* 233, U. S. 163.

Las palabras de la ley son completamente claras y sencillas y de dárseles la significación que ordinariamente se les da no dejan lugar a dudas respecto al fin que tuvo presente el legislador. Cualquier tentativa que se haga por dar una explicación mejor al claro lenguaje del texto sin exten-

derse en la misma, puede resultar en una restricción tal de su significado evidente a todas luces que equivalga a una eliminación.

La sección 1ª. se refiere a todos los casos en que el Gobierno trata de recaudar contribuciones que se alegan o reclaman como debidas, y exige que si el supuesto deudor cree que el cobro es injusto o ilegal, o que se hace contra las disposiciones de cualquier estatuto, pagará dichas contribuciones bajo protesta. Luego el contribuyente puede establecer una acción para obtener la devolución de la suma así pagada, y si se decidiere, teniendo en cuenta los méritos del caso que la cantidad fué injustamente recaudada, porque no se adeudaba, el tribunal sentenciador puede certificar que dichas contribuciones fueron pagadas sin existir razón para ello y que deben ser reintegradas e inmediatamente el Tesorero procederá a su reintegro. Y finalmente, en todos los casos en que por cualquier motivo una persona alegue que la contribución que se le ha cobrado fué recaudada injusta o ilegalmente, el recurso que ha de utilizar dicha persona es el que queda determinado antes, y ningún otro. La legislatura le dice, por tanto, al contribuyente: en adelante usted no impedirá, detendrá o demorará el cobro de ninguna renta que se alegue o reclame como debida al Gobierno por injusta o ilegal que pueda ser, sino que usted la pagará ya que se deba o no sin tener en cuenta alguna o toda cuestión de derecho y de justicia; y como compensación por la pérdida de sus remedios en equidad y por la molestia que lleva consigo ese pago obligatorio, entonces puede usted probar, si puede hacerlo, que teniendo en cuenta los méritos del caso dicha cantidad fué recaudada injusta e ilegalmente puesto que no se debía, y debe ser reintegrada, en cuyo caso la corte así lo certificará y el Tesorero procederá a hacer su reintegro.

En el caso de *South Spring R. & C. Co.* v. *State Board of Equalization,* 139 Pac. 159, la Corte Suprema de New Mexico se expresó en estos términos:

"Debe notarse que la palabra 'injusticia' al contribuyente, se emplea en esta sección. La palabra 'injusticia' parece ser el término más amplio que la legislatura pudo haber empleado en relación con esto. Cualquier caso de valoración excesiva de la propiedad del contribuyente parece ser claramente una injusticia de acuerdo con el significado de esta ley. Debe notarse además que la injusticia que se descubre después que las planillas de contribución vienen a manos del colector, puede ser remediada de conformidad con los términos de esta sección. Por tanto, parecería claro que el hecho de que la junta del estado hubiera aumentado la valoración fijada de la propiedad de cualquier clase determinada no privaría a ningún contribuyente incluído en esa clase de buscar el remedio prescrito. La acción de la junta de igualamiento del estado no es final en cuanto a las reclamaciones de cualquier contribuyente del estado."

En el caso de *Armstrong* v. *Ogden City,* 43 Pac. 119, encontramos lo siguiente:

"También se insiste por los apelantes en que los demandados no pueden recobrar las contribuciones pagadas por ellos bajo protesta, porque el artículo 1, página 58, leyes de la sesión de 1890, dispone que 'cualquier parte que se sienta agraviada por cualquier contribución o tasación o procedimiento especial, como queda dicho, puede pagar dichas contribuciones especiales que han sido tasadas o impuestas a su propiedad, o aquellos plazos de la misma que estén vencidos, en cualquier tiempo antes de que los mismos resulten morosos, bajo protesta, avisando por escrito al colector de la ciudad que pretende establecer una acción para recobrar dichas contribuciones, cuyo aviso determinará detalladamente el supuesto perjuicio y motivos en que se funda, y dicha parte entonces tendrá el derecho de establecer una acción civil dentro de los sesenta días siguientes, y no más tarde, para recobrar aquella parte de la contribución especial que demuestre que es ilegal, injustificada, e injusta, y las costas originadas por la sentencia serán fijadas por la corte según lo estime conveniente, cuyo remedio será exclusivo.' En este caso los apelados no dieron el aviso requerido ni iniciaron la acción dentro de los sesenta días después que las contribuciones eran morosas. Pero este estatuto no tiene en cuenta el caso en que todo el procedimiento inicial era absolutamente nulo y en que nunca se adquirió jurisdicción alguna para comenzar las mejoras o imponer la contribución. Esto aparece de una manera más clara si se lee el .precepto anterior en relación con el precepto que existe en la sección inmediatamente

precedente y que acabamos de citar.   Esa parte de la sección dice
lo siguiente: 'Ninguna contribución especial será declarada nula,
ni ninguna tasación o parte de la misma dejada sin efecto con
motivo de algún error o irregularidad cometido o que aparezca de
cualquiera de los procedimientos seguidos bajo esta ley.' En otras
palabras, si después de haber adquirido jurisdicción el concejo mu-
nicipal hubiera fijado erróneamente una contribución mayor de lo
necesario para pagar la mejora, o si el concejo municipal hubiera
tasado irregularmente más propiedad contra una persona de la que
ella poseía, entonces desde luego que la parte perjudicada se veía
obligada a corregir dicho error o irregularidad presentando el debido
aviso y empezando una acción como se prescribe en esta sección del
estatuto.   Pero no puede alegarse que cuando la contribución fué
enteramente nula e ilegal como en este caso, las partes perjudicadas
estuvieron obligadas a valerse de este remedio especial y sumario
cuando podían valerse de cualquier otro remedio en equidad.   Cree-
mos que el remedio adecuado fué empleado en esta acción.''

Con referencia a la misma alegación que fué promovida
en la apelación, la Corte Suprema de los Estados Unidos, en
*Ogden City* v. *Armstrong,* 168 U. S. 224, en la página 240,
dijo:

"En lo que respecta a esta alegación convenimos con la Corte
Suprema del territorio en que este estatuto es aplicable a los casos en
que solamente haya errores o irregularidades, valoraciones excesivas
u otros defectos que no son jurisdiccionales, pero que cuando el con-
cejo que no tiene jurisdicción para imponer una contribución no
podía proceder de acuerdo con el estatuto los contribuyentes no tienen
que proceder de acuerdo con el estatuto para recobrar el dinero
pagado.   Cuando la contribución era enteramente nula e ilegal como
en este caso, el estatuto y sus remedios por errores e irregularidades
no tienen aplicación.''

En el caso de *Ward* v. *Alsup,* 100 Tenn. 619, dice la corte
que el estatuto de Tennessee del cual es copiada nuestra ley
concede un remedio contra la tasación ''*ilegal, injusta o exce-
siva*'' pero ''claramente supone que el contribuyente, en caso
de valoraciones *irregulares, indebidas o excesivas* hechas por
los debidos funcionarios, debe haber formulado su queja ante
la junta creada por el estatuto para oir tales quejas.''   Se

resolvió que "para tener este remedio, a falta de fraude u otro fundamento que en equidad exija intervención, debe haberse valido de aquellas disposiciones del estatuto por las cuales se pudiera haber corregido la *injusticia* que se alega antes de que se impusiera la contribución y pudiera cobrarse." Los casos resueltos por la opinión fueron desestimados porque ninguna de las partes que en ellos formulaban quejas alegó que hubiera ido "alguna vez ante alguna junta de igualamiento y tratara de que fuera rectificada su tasación por la supuesta *ilegalidad, desigualidad o exorbitancia.*" Se cita más del contenido del caso en el de *Ríos* v. *Richardson, supra.* Aunque las cuestiones sometidas a la consideración de la Corte de Tennessee en el caso de *Ward* v. *Alsup* no fueron consideradas por sus méritos, de una lectura detenida de los informes y razonamientos comprendidos en las páginas 656 a la 737, del tomo 100, de las decisiones de Tennessee, parece desprenderse que el uso de las palabras arriba citadas no fué una inadvertencia. En el caso de *Louisville y Nashville R. R. Co.* v. *The State of Tennessee et al.,* 8 Reisk, 55 Tenn. 663, se dice lo siguiente en la página 806:

"El remedio prescrito por el estatuto es amplio, rápido y eficaz, y la indemnización del ciudadano que ha sido perjudicado está absolutamente garantizada."

Puede hacerse referencia a los casos de *City of Nashville* v. *Smith,* 12 Pickle, 86 Tenn. 213; *Railroad* v. *Williams,* 12 Pickle, 101 Tenn. 146; y al de *Tamble* v. *Pullman Co.,* 207 Fed. 30, como los únicos otros casos de Tennessee que hemos encontrado que tienden a dar siquiera la más débil luz lateral sobre la naturaleza y alcance del remedio que prescribe el estatuto de Tennessee. Véase también a *Montana Ore Purchasing Co.* v. *Maher,* 32 Mont. 480; *Hensley* v. *City of Butte,* 33 *id.* 206; *Cobban* v. *Meagher,* 42 *id.* 399; *Dolenty* v. *Broadwater Co.,* 45 *id.* 261; *Reilly* v. *Hatheway et al.,* 46 *id.* 1.

Los casos que siguen de New York aunque no son directamente de aplicación son, a la vez que interesantes, sugesti-

vos: *People ex rel. Rochester Tel. Co.* v. *Priest,* 95 App. Div.
44; *People ex rel. 23rd St. R. Co.* v. *Feitner,* 92 *id.* 518; *People ex rel. Hunt* v. *Priest,* 90 *id.* 520; *People ex rel. Citizens'
L. Co.* v. *Feitner,* 81 *id.* 118; *People ex rel. Manhattan R. Co.*
v. *Barker,* 48 *id.* 248.

Sostener la primera y cuarta proposiciones del demandado
y apelado en el sentido en que han sido alegadas en el argu-
mento, o sea, que la valoración de la propiedad por la Junta
de Igualamiento por excesiva que pueda ser, es en ausencia
de fraude, necesariamente final y concluyente para el contri-
buyente y no está sujeta a revisión por las cortes en una
acción para recobrar contribuciones pagadas bajo protesta
sería borrar del estatuto las palabras "todos los casos," "in-
justa," y "teniendo en cuenta los méritos del caso." No
creemos ni que la acción que se concede al contribuyente es
simplemente en sustitución del derecho a un *injunction,* del
que está privado expresamente, ni que el procedimiento que
tuvo en cuenta la legislatura es un mero ataque colateral.
No es la acción para recobrar dinero que se encuentra inde-
bidamente en poder de otro, *(assumpsit),* de la ley común,
adoptada a ciegas sin cambio o modificación por nuestra legis-
latura que ha de ser establecida dentro de los quince años
prescritos por el Código Civil para las acciones personales
que de otro modo no tengan señalado término especial de
prescripción, sino un procedimiento que ha de establecerse
dentro del mismo período fijado en el Código de Enjuicia-
miento Civil para perfeccionar una apelación contra una sen-
tencia de la corte de distrito, un procedimiento autorizado
con el fin de determinar, no sólo si el cobro era o no "ilegal
o contra lo dispuesto en algún estatuto," sino también si era
"injusto" o "ilegalmente cobrado por no estar debido,
*  *  * teniendo en cuenta los méritos del caso." Y si así
lo resuelve la corte no dicta la sentencia en la forma en que
ordinariamente se dicta en una acción ordinaria sobre cobro
de dinero, sino que "puede certificar de acuerdo con las cons-
tancias del caso, que las contribuciones fueron pagadas sin

existir razón para ello y que deben ser reintegradas.'' El
Juez de Circuito Dennison en el caso de *Tamble* v. *Pullman
Co., supra,* llama la atención hacia este aspecto distintivo:
''La sentencia dictada fué en la forma especial que solamente
está autorizada por el código, ordenando la devolución a la
Tesorería del Estado.'' Y ''ésta es únicamente una rebaja
hecha después que la contribución ha sido pagada o hecha
cumplir.'' Cooley sobre Contribuciones, (3ª. edición) 1396.

También debemos notar de paso que en el caso mencio-
nado en último término no se alegó al parecer que la resolu-
ción de la Junta de Revisión e Igualamiento era definitiva
y concluyente en el caso de una tasación y fijación de contri-
bución corriente, sino que la cuestión que realmente se pro-
movió aparece expresada en la opinión como sigue:

''Se ha dicho que el procedimiento para 'tasar contribuciones
por años anteriores,' no es la forma ordinaria de hacer la tasación
y fijación de una contribución, sino que es una investigación prac-
ticada por un tribunal competente en la cuestión relativa a si la
propiedad ha eludido el pago de la contribución así como del valor
de dicha propiedad; que este tribunal tiene facultad para dictar sen-
tencia por la suma total que encuentre que se debe; que se pres-
criben medios para la revisión de dicha sentencia por el tribunal
de apelación; pero que, como otras sentencias, no puede ser atacada
colateralmente.''

Apenas si es necesario agregar que ninguno de los casos
de *Briscoe* v. *McMillan,* 117 Tenn. 115, y *Smoky Mountain,
etc., Co.* v. *Lattimore,* 119 Tenn. 620, discutidos en el de *Tam-
ble* v. *Pullman Co.,* era un caso sobre cobro de contribucio-
nes pagadas bajo protesta.

No queremos deducir que toda valoración excesiva en au-
sencia absoluta de otras circunstancias sería suficiente para
sostener una acción sobre cobro de contribuciones; pero sí
creemos que si la valoración final hecha por la Junta de Revi-
sión e Igualamiento, ya considerada aisladamente, o como en el
caso de autos, en unión de otras circunstancias, es tan cla-
ramente excesiva que produzca una verdadera e inequívoca

opresión que equivalga a una injusticia clara y sustancial, entonces no debe negarse el acceso a las cortes al contribuyente que protesta de acuerdo con nuestro estatuto simplemente porque no puede demostrar fraude o propósito deliberado por parte de los tasadores, o porque la acción de la junta no es técnicamente ilegal o claramente contraria a algún estatuto. Y sostenemos, además, que si un demandante puede demostrar semejante injusticia sustancial, entonces la corte sentenciadora puede examinar y revisar la acción tomada por la Junta de Revisión e Igualamiento en tanto sea necesario para averiguar si las contribuciones en cuestión en realidad y según el sentir de la ley fueron cobradas o no injusta o ilegalmente y si deben ser reintegradas.

No creemos que el resultado de tal interpretación de la ley ha de ser el de llenar los calendarios de nuestras cortes o el de obligarlas a asumir en cualquier grado alarmante las funciones de una segunda y superior Junta de Revisión e Igualamiento. Aunque no trataremos ahora de anticiparnos a establecer ninguna regla definida por la que deban regirse las cortes sentenciadoras al determinar si cierta relación de hechos constituye una causa de acción o lo que debe mostrar la prueba en cualquier caso hipotético, sino que preferiremos dejar que cada caso sucesivo esté sostenido por sus propias alegaciones y sea resuelto a medida que surja por su matiz especial, debemos sugerir, sin embargo, que una sana aplicación de la máxima de *minimus non curat lex,* reforzada de ser necesario en cierto modo por el razonamiento fundamental y principios generales que sirven de base a la mayor parte de las decisiones que han sido citadas por el demandado, apelado, y tal vez por la doctrina de varios de los casos de New York, *supra,* en tanto son aplicables, será más que suficiente para desalentar el establecimiento de acciones simuladas, frívolas o meramente molestosas.

Pero el demandante y apelante en este caso no se funda únicamente en una supuesta valoración excesiva. La parte esencial de su causa de acción como aparece expresada en

la demanda se encuentra en la alegación terminante de que el método que fué adoptado por la junta es "ilegal, nulo, injusto y que establece discrimen;" que la supuesta unidad empleada por dicha junta "no es por ningún concepto un verdadero y correcto criterio del valor de algunas de las factorías de azúcar de Puerto Rico, y mucho menos tratándose de la factoría de azúcar del demandante; que la capacidad de dicha factoría del demandante es cerca de dos veces la de la factoría mayor de la isla, y es cerca de cinco o seis veces mayor que la de otras factorías; que el costo de la maquinaria para la factoría del demandante es muy distinto de aquel de las otras factorías de la isla, y que al adoptar una unidad o tipo tan grande para la tasación el resultado obtenido es una valoración errónea e incorrecta;" que en contra de la ley y más específicamente a la Constitución de los Estados Unidos y las disposiciones de la Ley Orgánica que disponen que se impondrá y cobrará contribución sobre el valor de las propiedades basadas en una valoración de las mismas, la propiedad de la demandante no fué valorada como propiedad tangible sino como una factoría imaginaria que sólo existe en la mente de los miembros de dicha junta que de tal modo han pretendido imponer contribución a algo que el apelante podría haber tenido pero que no tenía y por lo que no podía imponérsele contribución.

En lo que respecta a la segunda proposición general del demandado por las mismas razones expresadas al discutir la primera y cuarta proposición nos inclinamos a resolver que si la adopción por la Junta de Revisión e Igualamiento de principios erróneos resulta en una injusticia sustancial para el contribuyente, no importa si la cuestión que se discute es una legal solamente o si también envuelve una consideración de principios de economía política.

En contestación a la tercera proposición que ha sido alegada por el apelado citamos con aprobación del alegato del

apelante un párrafo que parece haber pasado desapercibido enteramente para el demandado y apelado:

"Estamos de acuerdo en que es menester probar que tales principios erróneos han sido adoptados, pero la adopción de estos principios sólo puede demostrarse por medio de evidencia en un juicio, y no se exige que aparezca del texto de la demanda, supuesto que uno no puede alegar evidencia. Los récords oficiales de la Junta de Revisión e Igualamiento no han sido traídos a la vista de la corte; no pueden constar ante la corte, porque solamente pueden ser presentados en el juicio mediante la orden correspondiente dirigida al archivero. El apelante no puede alegar el contenido de documentos de los cuales no está en posesión, cuyos documentos están en la exclusiva posesión de la parte contraria, y huelga el citar jurisprudencia para demostrar que la falta de alegaciones concretas en una demanda en lo que respecta a cuestiones del dominio exclusivo de la parte contraria no constituye fundamento para desestimar una demanda con una excepción previa."

Existen más méritos en la quinta proposición presentada por el demandado. Estamos bastante inclinados a convenir en que ni la Ley Orgánica ni el Código Político tuvieron por objeto el restringir la contribución y tasación de las factorías de azúcar a una base tan escueta, como la suma del valor calculado de cada pieza individual, separada y distinta que forman el molino o siquiera a ese valor más el costo de construcción; y también convenimos en que la alegación de que podía obtenerse por el demandante otro molino igual al que tiene con menos dinero de la cantidad en que fué tasado no demuestra en manera alguna la impropiedad o injusticia de la tasación. Sin embargo, de ser esto cierto es un hecho digno de ser tomado en consideración en relación con los demás factores tal vez más importantes. Puede ser que si el demandante no hubiera alegado nada más de lo que aparece de la demanda con referencia el verdadero valor y al valor en tasación del molino podríamos haber resuelto que no aparecía tal exceso por sí solo y en ausencia de algo más que una mera diferencia de opinión con respecto al valor podría decirse

que envuelve *prima facie* una verdadera injusticia dentro del significado del estatuto. Puede ser que el demandante, aun cuando pueda probar un método erróneo de tasación no pueda demostrar que el resultado es tan excesivo que resulte injusto en vista de la dificultad inherente en llegar a una determinación completamente exacta de cuestiones de valor, y que la corte sentenciadora no habrá de encontrar motivo suficiente para modificar o alterar el fallo de la Junta de Revisión e Igualamiento. En verdad que el hecho de que la valoración hecha es solamente el cincuenta por ciento sobre el valor total de las partes componentes del molino, y al parecer hasta menos en exceso de lo que costaría otro molino igual sugiere fuertemente no sólo un método de tasación que conduce a resultados aproximadamente justos y equitativos sino también a una mera diferencia de criterio respecto al verdadero valor que es demasiado insignificante para justificar la sustitución del criterio de la corte sentenciadora por el de la Junta de Revisión e Igualamiento. Pero éstas son cuestiones que pueden ser resueltas más satisfactoriamente después de oir la prueba que el demandante pueda ofrecer. Aunque la demanda deja mucho que desear en cuanto a este particular, el demandante en verdad alega ''que el verdadero y correcto valor de la factoría de azúcar es la cantidad de $1,203,891;'' y que el demandante ha estado obligado a pagar y ha pagado sobre una valoración de $1,800,000, a la cual se ha llegado como resultado de un método de tasación ilegal, nulo, injusto y que establece discrimen. Creemos que el demandante tiene derecho a probar, si puede hacerlo, que su molino jamás ha sido tasado en realidad, o si lo ha sido, la tasación se ha llevado a cabo injusta e ilegalmente; y, por tanto, que ha sido privado injustamente de una suma de más de $7,000 como resultado de dicho supuesto método erróneo de tasación.

La demanda, examinada en conjunto, expresa hechos suficientes para determinar una causa de acción, y la sentencia

apelada debe ser revocada y el caso devuelto para ulteriores.
procedimientos que no sean incompatibles con esta opinión.

> *Revocada la sentencia apelada y devuelto el*
> *caso para ulteriores procedimientos no in-*
> *compatibles con la opinión.*

Jueces concurrentes: Sres. Presidente Hernández y Aso-
ciado Aldrey.

El Juez Asociado Sr. Wolf firmó: ''estoy conforme con
la precedente opinión menos con aquella parte de su razona-
miento que depende del caso *Ward* v. *Alsup,* 46 S. W. 573.''

El Juez Asociado Sr. del Toro disintió.

OPINIÓN DISIDENTE DEL JUEZ ASOCIADO SR. DEL TORO.

El presente es un pleito sobre devolución de contribucio-
nes pagadas bajo protesta.  La demanda es como sigue:

''El demandante, por su abogado Edward S. Paine, establece
esta demanda contra el demandado, y alega lo siguiente por infor-
mación y creencia:

''1. Que el demandante es una corporación debidamente organi-
zada y existente, en virtud y de acuerdo con las leyes del Estado de
Connecticut y está debidamente autorizado a hacer negocios en Puerto
Rico.

''2. Que el demandado, Allan H. Richardson, es el Tesorero de
Puerto Rico debidamente nombrado y capacitado y actualmente de-
sempeña dicho cargo.

''3. Que Allan H. Richardson, como Tesorero de Puerto Rico, es
el funcionario a quien la ley ha encomendado el deber de tasar,
determinar el importe y cobrar todas las contribuciones a los indi-
viduos y corporaciones de la Isla de Puerto Rico y eso incluye la
tasación, imposición y cobro de todas las contribuciones sobre la
propiedad del demandante en Puerto Rico.

''4. Que el demandante es y ha sido dueño durante algún tiempo
y ha tenido y poseído ciertos terrenos, y es y ha sido dueño de cierta
maquinaria y edificios y otras propiedades en la Isla de Puerto Rico
sobre los cuales el Gobierno de Puerto Rico ha impuesto ciertas con-
tribuciones, estando situadas dichas propiedades en el distrito muni-
cipal de Guánica, Puerto Rico.

''5. Que anteriormente y entre los meses de enero y agosto de 1913, ambos inclusive, al cumplir con las disposiciones de la ley para tal caso hecha y prevista, el demandado, como Tesorero de Puerto Rico, tasó la propiedad del demandante para el año económico que empieza el primer día de julio de 1913 y termina el treinta de junio de 1914. Que para los fines de tasación el expresado demandado, obrando bajo las disposiciones de dicha ley, exigió y solicitó del demandante le suministrase un estado bajo juramento abarcando todas las propiedades poseídas por el demandante en la Isla de Puerto Rico, especificando su verdadero y efectivo valor. Que el demandante para cumplir con dicha exigencia y demanda, suministró al Tesorero de Puerto Rico un estado bajo juramento respecto a sus propiedades reales y personales, especificando el verdadero y efectivo valor de las mismas, cuyo estado fué aceptado y considerado por el demandado, como Tesorero de Puerto Rico.

''6. Que una gran parte del negocio del demandante consiste en moler cañas y extraerles el jugo, convirtiendo el jugo de dichas cañas cultivadas en Puerto Rico en azúcar centrífuga y primera. Que con tal fin ha construído sobre su propiedad real en dicho distrito municipal de Guánica una factoría de azúcar completamente equipada para moler cañas y extraerles el jugo y convertir éste en azúcar.

''7. Que una lista completa de toda la maquinaria y otros aparatos, útiles y accesorios empleados en dicha fábrica y el verdadero valor de los mismos fué dado a dicho demandado, como Tesorero de Puerto Rico, a petición y demanda hecha por éste, en una planilla impresa suministrada por el demandado al demandante y conocida y designada como '*Exhibit* 5, Factoría de Azúcar,' al contenido de la cual nos remitimos. Que este *exhibit* es parte del estado jurado a que nos referimos anteriormente y el demandante alega que es un verdadero, completo, correcto y cabal inventario de la maquinaria, equipo, útiles y accesorios de dicha factoría de azúcar y contiene una tasación verdadera, correcta y completa del verdadero valor de todas y cada una de las partes componentes de dicha factoría. Y el demandante alega que el valor así fijado a dicha factoría en el tiempo en que se le suministró la tal planilla denominada más particularmente '*Exhibit* 5 Factoría de Azúcar,' era el verdadero valor entonces y en el tiempo en que se hizo la tasación de la propiedad del demandante que anteriormente y más adelante se menciona.

''8. Que no se obtuvo ninguna otra información, ni se hizo otro examen, ni tampoco se empleó otro medio de averiguar el verdadero valor de la factoría del demandante por el demandado, como Teso-

rero de Puerto Rico o por los tasadores o sub-tasadores nombrados
con el fin de ayudar a dicho demandado en la referida tasación, a no
ser el examen hecho por ellos de dicho 'Exhibit 5, Factoría de Azúcar'
y la tabla de tasación a que nos referiremos más adelante.

"9. Que posteriormente, durante el mes de agosto de 1913, dicho
demandado, como Tesorero de Puerto Rico, alegando que obraba por
y en virtud de la ley para tal caso hecha y prevista, impuso contri-
bución al demandante por concepto de su factoría sobre una tasación
de $1,800,000, y posteriormente, allá para el día 29 de agosto de 1913,
el demandante recibió un aviso de la expresada tasación junto con
otras al contenido de cuyo aviso nos remitimos.

"10. Que al recibo de tal aviso y en tiempo propio el demandante
notificó debidamente a la Junta de Revisión e Igualamiento, según lo
exige la ley, su protesta contra tal tasación, al contenido de cuya
protesta nos remitimos. Que como puede verse tanto en el aviso
de tasación como en la protesta se incluía dicha factoría de azúcar
de la propiedad del demandante.

"11. Que la tasación fijada por el demandante sobre las partidas
mencionadas en el referido 'Exhibit 5, Factoría de Azúcar' fué
$1,203,891, siendo aproximadamente $600,000 menos que la tasación
fijada por el demandado, como Tesorero de Puerto Rico, para los
fines de contribución. Que el demandante por medio de uno de sus
oficiales autorizados requirió al demandado para que le informase
qué partidas había aumentado en dicho 'Exhibit 5, Factoría de Azú-
car', a fin de poder determinar los puntos de diferencia entre dichas
tasaciones y estar en condiciones de poder discutir el asunto ante la
Junta de Revisión e Igualamiento. Que dicho demandado, como Te-
sorero de Puerto Rico, por conducto de la persona que entonces ac-
tuaba como Tesorero de Puerto Rico, interino, en ausencia del de-
mandado, rehusó suministrar dicha información, manifestando que
la tasación de la factoría fué fijada en globo.

"12. Que la Junta de Revisión e Igualamiento oyó la protesta
del demandante, en cuya vista el demandante estuvo representado
por un oficial autorizado, y posteriormente, en una fecha desconocida
para el demandante, la Junta de Revisión e Igualamiento resolvió la
protesta del demandante y confirmó la tasación de la factoría del de-
mandante en $1,800,000.

"13. Que posteriormente, y allá por el 17 de abril de 1914 el
demandante recibió un aviso, al contenido del cual nos remitimos,
cuyo aviso, firmado por el demandado como Presidente de la Junta
de Revisión e Igualamiento, parece representar la verdadera tasación

de la propiedad del demandante según se ha fijado por la Junta de Revisión e Igualamiento, y sobre cuya tasación tuvo el demandante que pagar contribuciones.

"14. Que posteriormente y allá para el día 27 de abril de 1914, o antes, el demandante recibió un aviso del demandado, como Tesorero de Puerto Rico, enviado por un tal M. J. Harrison, Colector de Rentas, en el cual le informaba el importe de las contribuciones impuéstales como resultado de tal tasación, para el año económico de 1913-14, y la suma allí mencionada era la de 28,380.10, cuya cantidad es el importe de la contribución sobre la propiedad real y personal del demandante en la Isla de Puerto Rico, y cuya cantidad incluye la contribución calculada a razón de 1.2 por ciento por año sobre la tasación de la factoría de azúcar anteriormente descrita de $1,800,000; a saber, la suma de $21,000.

"15. Que dichas contribuciones se adeudaban y debían pagarse inmediatamente y que en cuanto a todas las cantidades no satisfechas antes del primero de junio de 1914 se impondría una penalidad de un recargo mensual del 1 por ciento cada mes que transcurriese sin hacerse el pago y que el Tesorero de Puerto Rico, obrando en virtud y de acuerdo con la ley para tal caso hecha y prevista, y por conducto de sus propios agentes y auxiliares, amenazó embargar la propiedad del demandante si no se pagaban las contribuciones, por lo que el demandante, allá para el día 28 de abril de 1914, pagó dichas contribuciones bajo protesta de acuerdo con las disposiciones de la ley de marzo 9 de 1911, por medio de un cheque a la orden del Tesorero de Puerto Rico, cheque que se había endosado 'Pago bajo protesta y de acuerdo con la ley de 9 de marzo de 1911', y que fué remitido con una carta fechada abril 24 de 1914, expresando los fundamentos de la protesta a los términos de cuya carta nos remitimos.

"16. Que la tasación de $1,800,000 de la factoría de azúcar del demandante es exagerada y excesiva y no representa el verdadero valor de dicha propiedad y que el verdadero y correcto valor de la factoría de azúcar es la cantidad de $1,203,891. Que la valoración verdadera y correcta es la que se da en el '*Exhibit* 5, Factoría de Azúcar' y que dicho *exhibit* era la única fuente legal de información en cuanto al valor real en Puerto Rico de la expresada factoría, maquinaria, útiles y accesorios en la fecha en que se hizo la tasación por el demandado y en la fecha en que se revisó dicha tasación por la Junta de Revisión e Igualamiento.

"17. Que el demandado, como Tesorero de Puerto Rico, y dicha Junta de Revisión e Igualamiento adoptaron un método ilegal, nulo,

injusto y que establece discrimen al fijar la tasación de la factoría: del demandante y al imponer la contribución sobre la base de tal tasación. Que el método de tasación e imposición a que nos referimos: es el siguiente:

"El demandado, como Tesorero de Puerto Rico, mandó preparar una tarifa o tabla de tasación en la que colocó ciertos números, representando éstos el supuesto valor de las factorías de azúcar de ciertas corporaciones, que poseen y explotan factorías de azúcar en la Isla de Puerto Rico, siendo veintitrés aproximadamente el número de aquéllas. Hizo también que se pusiesen números demostrando las tasaciones anteriores de las referidas factorías y un cálculo del costo de las varias partes de la maquinaria, incluyendo calderas, centrífugas, clarificadores, tachos al vacío y otros implementos y accesorios. Y el total de estos números representando el supuesto costo de dicha maquinaria de cada factoría se dividía por el número de toneladas de cañas capaz de ser molidas diariamente y los números así obtenidos en cada factoría se sumaban y el resultado se divide por el promedio obtenido entre el número de factorías, formándose así, junto con los otros elementos, tales como el trasporte, construcción y entretenimiento, un supuesto promedio del costo de maquinaria de azúcar por tonelada por día. El tipo de unidad o promedio obtenido fué el de $500,000 aproximadamente.

"18. Que sobre este tipo o base de unidad o promedio la referida factoría de azúcar del demandante con su capacidad de 3,700 toneladas por día tendría un valor de $1,850,000, pero debido a condiciones de sequía y a otros elementos, y para fijar la tasación en un número redondo se rebajó a $1,800.000.

"19. Que esta supuesta unidad no es por ningún concepto un verdadero y correcto criterio del valor de algunas de las factorías de azúcar de Puerto Rico y mucho menos tratándose de la factoría de azúcar del demandante; que la capacidad de la factoría del demandante es cerca de dos veces la de la factoría mayor de la isla y es cerca de cinco o seis veces mayor que la de otras factorías; que el costo de la maquinaria para la factoría del demandante es muy distinto de aquel de las otras factorías de la isla y que al adoptar una unidad o tipo tan grande para la tasación el resultado obtenido es una valoración errónea e incorrecta, siendo la tasación contraria a la Constitución de los Estados Unidos y a las Enmiendas Quinta y Décimacuarta de la misma, y a la ley del Congreso de los Estados Unidos aprobada abril 12 de 1900, titulada 'Ley para proveer, temporalmente, de rentas y un gobierno civil a la Isla de Puerto Rico y para

otros fines' las que disponen que se·impondrá y cobrará contribuciones sobre el valor de las propiedades sujetas a contribución.

"20. Que la tasación así hecha por el demandado y por la Junta de Revisión e Igualamiento, no sólo es excesiva en cuanto a la factoría del demandante, sino que es posible construir una factoría nueva completamente acabada, parecida en diseño pero superior en capacidad productiva a la factoría que ahora está en explotación, incluyendo el costo de trasporte, construcción, y entretenimiento por una cantidad mucho menor que $1,800,000.

"21. Que la diferencia entre el valor de la factoría del demandante según fué tasada, a saber, $1,800,000 y el verdadero y efectivo valor de la misma de $1,203,891 es de $596,109. Y que la contribución sobre esa suma al tipo de 1.2 por ciento por año asciende a $7,153.31, cuya contribución se ha pagado bajo protesta por las razones que anteriormente se mencionan.

"22. Que la ley aprobada marzo 9 de 1911, titulada 'Ley disponiendo el pago de contribuciones, bajo protesta, estableciendo un procedimiento para exigir la devolución de las mismas, y para otros fines' dispone que pueden pagarse contribuciones bajo protesta, y que la parte que las pagare puede en cualquier tiempo dentro de treinta días después de dicho pago demandar al Tesorero de Puerto Rico por dicha suma, y si se decidiere, teniendo en cuenta los méritos del caso, que la cantidad fué recaudada injustamente, el tribunal que conozca del asunto, podrá certificar, de acuerdo con las constancias del mismo, que las contribuciones de referencia fueron pagadas sin existir razón para ello, y que entonces el Tesorero procederá a su reintegro; y dicha ley además dispone que no habrá ningún otro recurso en casos de recaudación ilegal de contribuciones o rentas, o en casos de tentativas para recaudar ilegalmente contribuciones o rentas.

"Por lo cual el demandante suplica que este tribunal certifique de acuerdo con las constancias del caso que la tasación que excedió de $1,203,891 es excesiva e ilegal y que la cantidad de $7,153.91 fué indebidamente pagada y debe ser reintegrada y que se dicte sentencia ordenando al Tesorero de Puerto Rico a reintegrar dicha suma, debiendo verificarse ese pago con preferencia a cualquiera otra reclamación contra el Tesorero.

"(Firmado)      EDWARD S. PAINE,
*Abogado del demandante.*"

Emplazado el demandado, excepcionó la demanda alegando que era ambigua, ininteligible y dudosa y que no aducía he-

chos suficientes para determinar una causa de acción. También la contestó aceptando la verdad de algunos de sus hechos, negando la de otros y alegando materia nueva en oposición a la misma. La corte de distrito oyó las excepciones previas y, el 26 de marzo de 1915, dictó sentencia desestimando la demanda por no aducir hechos suficientes para determinar una causa de acción. La parte demandante recurrió entonces de la sentencia para ante el Tribunal Supremo, habiéndose celebrado la vista del recurso el 23 de noviembre de 1915.

Sostiene la apelante en su alegato que la corte sentenciadora erró:

1. Porque la decisión de la Junta de Revisión e Igualamiento sobre la valuación de la propiedad, no era definitiva.

2. Porque el propósito de la ley de 9 de marzo de 1911, era el de proveer una revisión judicial cabal de todos los actos de la Junta de Revisión e Igualamiento.

3. Porque el caso de la *Sucesión Puente* v. *El Pueblo de Puerto Rico*, 19 D. P. R., 557, no es análogo al presente, y

4. Porque la adopción por la Junta de Revisión e Igualamiento de un principio fundamental erróneo, es suficiente para desautorizar la acción de dicha junta.

En tal virtud, la cuestión fundamental envuelta en este caso, reduciéndola a sus últimos límites, es la de si la resolución a que llegara la Junta de Revisión e Igualamiento en este caso, es o no definitiva. La demandante dió a sus propiedades un valor de $1,203,891. El Tesorero de Puerto Rico las tasó en $1,800,000. La demandante recurrió para ante la Junta de Revisión e Igualamiento; la junta examinó el caso y sostuvo la tasación del Tesorero. La demandante entonces pagó bajo protesta la contribución que se le impuso e inició este pleito reclamando la devolución de lo pagado por la diferencia entre $1,203,891 y $1,800,000, que la demandante calcula en $7,153.91. ¿Pudo recurrir la demandante para ante

los tribunales de justicia, o debe concluirse, atendidos los hechos alegados en su demanda, que tuvo ya su día en corte y que su caso fué definitivamente resuelto por los tribunales administrativos? Tal es, repito, la cuestión fundamental envuelta en el recurso.

Una de las primeras leyes que aprobó la Asamblea Legislativa de Puerto Rico creada por la Ley Orgánica de abril 12, 1900, fué la de rentas que luego, en 1902, se hizo formar parte del Código Político. La ley se ha enmendado en varias ocasiones, pero en la mayor parte de sus preceptos fundamentales, subsiste en la actualidad en todo su vigor.

La Junta de Revisión e Igualamiento a que me he referido anteriormente, fué constituída por la expresada ley como un verdadero tribunal administrativo, cuyas resoluciones tenían el carácter de firmes. Arts. 308 al 313 del Código Político.

Y el Tribunal Supremo de Puerto Rico, en los casos de *Caneja* v. *El Pueblo,* 12 D. P. R. 247, y *Guitián* v. *El Gobierno de Puerto Rico,* 12 D. P. R. 252, refiriéndose a la junta, dijo:

"Atendida la organización de la Junta de Revisión e Igualamiento en la forma dispuesta por el artículo 308, sus resoluciones en materia concerniente a la valoración de la propiedad, han de ofrecer más garantías de acierto que las de un tribunal de derecho, unipersonal o colegiado, cuyos miembros no necesitan estar versados en asuntos relativos al valor de la propiedad de Puerto Rico, como sucede con dos de los que han de componer dicha junta.

"Además, la Junta de Revisión oye a los agraviados y admite pruebas para el mejor desempeño de sus funciones, y esas pruebas con las ilustraciones que puedan dar a la junta sus dos miembros versados en asuntos relativos al valor de la propiedad son desconocidas por el juez o tribunal de derecho ante quien se recurre contra resolución de la junta, resolución que podría ser revocada, en virtud de pruebas distintas y aun contrarias a las que le sirvieron de fundamento, pues no es lógico suponer que la parte recurrente utilizara, ante el tribunal de derecho, pruebas que le fueron adversas ante la Junta de Revisión, máxime si se atiende a la facilidad de encontrar las pruebas que se deseen en materia tan sujeta a apreciaciones diversas, como lo es la valoración de la propiedad.

"Sin duda, por las razones expuestas y otras que no se escaparían a la sabia penetración del legislador, dispone el artículo 310 que la decisión de la junta en todo asunto que le sea presentado será firme; y ante precepto tan absoluto y terminante huelga toda discusión. *Dura lex, sed lex."   Caneja* v. *El Pueblo,* 12 D. P. R. 247, 250.

"Pero el artículo 310 dice claramente que la decisión de la junta en todo asunto que le sea presentado, será firme. Nosotros creemos que esto impide completamente el que se apele o revise, mediante *certiorari,* o en otra forma ante los tribunales ordinarios, las decisiones dictadas por la Junta de Revisión e Igualamiento. Tales asuntos corresponden al ramo o departamento ejecutivo del Gobierno, y éste ha constituído una junta, la cual, como se ha dicho en las decisiones de los tribunales de Nueva York, tiene poderes judiciales en todo aquello que se halla comprendido dentro del limitado círculo de su jurisdicción; y no ha habido la intención de convertir los tribunales ordinarios de la isla, que han sido constituídos para juzgar y decidir las controversias entre partes, en árbitros e inspectores de las listas de contribuciones formadas en las oficinas del Tesorero, y corregidas por la junta nombrada para ese fin." *Guitián* v. *El Gobierno de Puerto Rico,* 12 D. P. R. 252, 263.

Así las cosas, la Legislatura de Puerto Rico pasó en 1911 la ley No. 35 disponiendo el pago de contribuciones bajo protesta, estableciendo un procedimiento para exigir la devolución de las mismas, y para otros fines.

¿Alteró esa ley el sistema y la jurisprudencia establecidos? Veámoslo.

Nada dispuso en relación con la tasación de contribuciones. Nada con respecto a la organización de la Junta de Revisión e Igualamiento. Sus disposiciones se refieren todas al método que debe seguirse para recobrar ciertas contribuciones pagadas bajo protesta. No contiene la cláusula usual derogatoria de otras leyes.

Con anterioridad al 1911, el recurso judicial que los contribuyentes tenían en esta isla para oponerse al cobro de contribuciones ilegales, estuvo prescrito en la sección 14 de la ley sobre *injunctions* de 1902, sección 356 de los Estatutos Revisados y Códigos de Puerto Rico, 1902, y quedó luego fijado en la sección 12 de la ley sobre *injunctions* de 1906,

Leyes de 1906, página 85, que, copiada a la letra, en lo per-
tinente, es como sigue:

"Sección 12.—Puede otorgarse un *injunction* para impedir la
imposición ilegal de cualquier contribución, carga o derecho, que sea
ilegal, o cualquier procedimiento para hacerlo cumplir; y cualquier
número de personas, cuyas propiedades se hallen afectadas por una
contribución o derecho así impuesto, pueden unirse en la solicitud
para obtener aquel *injunction* ＊ ＊ ＊."

En 1911, por la citada ley No. 35, sección 6 de la misma,
se modificó la sección 12 de la Ley de *Injunctions* de 1906,
eliminándose todo lo que dejo transcrito, y se prescribió un
nuevo método para la devolución de contribuciones injustas
e ilegales pagadas bajo protesta, disponiéndose que "En nin-
gún caso se expedirá auto alguno para impedir la recauda-
ción de contribuciones o rentas devengadas, o para obstacu-
lizar y demorar esa recaudación, ya se trate de un *superse-
deas,* un auto prohibitorio, o cualquier otro auto o procedi-
miento; y en todos los casos en que, por cualquier motivo,
una persona alegue que la contribución que se le ha cobrado
fué recaudada injusta e ilegalmente, el recurso que ha de
utilizar dicha persona es el que queda determinado antes,
y ningún otro." Sec. 5 de la ley No. 35 de 1911.

1. ¿Derogó implícitamente la ley No. 35 los preceptos del
Código Político relativos a la Junta de Revisión e Iguala-
miento? 2. Si no los derogó, si partió de la base de la exis-
tencia de tal organismo, ¿estableció un procedimiento por
virtud del cual pueden revisarse todas sus resoluciones ante
los tribunales, modificando así el artículo 310 del Código Polí-
tico que prescribe que las resoluciones de la junta tienen
el carácter de firmes? 3. ¿Se limitó dicha ley número 35
a tomar el lugar de los antiguos *injunctions,* dejando sub-
sistentes en toda su integridad los preceptos del Código Polí-
tico relativos a la Junta de Revisión e Igualamiento, limi-
tando su campo de acción a casos de verdaderas contribu-
ciones ilegales, esto es, no autorizadas por la ley, o en que
se hubiera cometido fraude, o se hubiere procedido con la

manifiesta intención de perjudicar al contribuyente, o se hubiere adoptado por la junta principios de tal manera erróneos que pudiera concluirse que la junta había actuado sin jurisdicción?

La ley número 35 procede del Estado de Tennessee. Fué introducida en Puerto Rico por Foster V. Brown, entonces Fiscal General de la isla, y antes y ahora abogado del indicado estado de la Unión americana. A la jurisprudencia de dicho estado debe acudirse, pues, para interpretarla.

He examinado los casos de *Tennessee* v. *Sneed*, 96 U. S. 69; *Briscoe* v. *McMillan*, 117 Tenn. 115; *Bank* v. *Memphis*, 107 Tenn. 66; *Ward* v. *Alsup*, 100 Tenn. 619, y *Tamble* v. *Pullman Co.*, 207 Fed. 30, invocados por el mismo apelante, y aunque en ninguno de ellos se resuelve concretamente la cuestión planteada, su estudio permite proceder con cierta seguridad al fijar el alcance de la ley número 35 tantas veces citada.

Del caso de *Tennessee* v. *Sneed, supra,* aparece que un contribuyente trató de pagar cierta suma, parte en dinero y parte en billetes del Banco de Tennessee. El colector se negó a recibir el pago. El contribuyente inició entonces contra el colector un procedimiento de *mandamus*. Entre las razones que se alegaron en contra de la expedición del auto, estuvo la de que el procedimiento único que debió haber seguido el contribuyente fué el fijado por la ley de Tennessee origen de la ley número 35 de 1911 de Puerto Rico. La corte desestimó la solicitud. El contribuyente apeló a la Corte Suprema del Estado y ésta confirmó la sentencia apelada. Recurrió entonces el contribuyente a la Corte Suprema de los Estados Unidos y dicho tribunal, después de analizar los hechos y las leyes aplicables, terminó su opinión así:

"Si damos por sentado que con anterioridad al año 1873 el peticionario tenía facultad para establecer su reclamación contra el Estado mediante *mandamus,* y que según los estatutos de ese año el seguir utilizando ese medio le estaba prohibido, la cuestión es si le quedó, o había dispuesto algún remedio eficaz para él. Creemos

que los preceptos del estatuto le dieron un medio suficiente para hacer valer un derecho como el que tenía. Disponía el estatuto que podría pagar la suma que se le reclamaba al colector, bajo protesta, dando conocimiento de ello al auditor de la tesorería; que en cualquier fecha dentro de los treinta días siguientes podía establecer una acción contra el funcionario que hacía él cobro; que el caso debía ser juzgado por una corte con jurisdicción, y si fallaba a favor del demandante por razón de los méritos, la corte debía certificar que dicha suma fué satisfecha indebidamente y ser devuelta y el interventor expediría al efecto un libramiento por la misma la que sería satisfecha con preferencia a otras reclamaciones de la tesorería.

''Este remedio es sencillo y eficaz. Una acción para recobrar dinero que ha sido exigido ilegalmente es tan rápida, fácilmente juzgada y menos complicada que un procedimiento de *mandamus*. Todo abogado sabe cómo ha de establecer la primera, mientras que muchos tropezarían con dificultades por las formas del segundo. También se prescribe lo necesario para el pronto pago de la suma por el Estado si se dicta sentencia sobre los méritos contra el funcionario.

''No se nos citan estatutos que autoricen el establecer acciones contra el Estado directamente y no conocemos ninguno. En una clase especial y limitada de casos, los Estados Unidos permiten ser demandados en la Corte de Reclamaciones, pero esa no es la regla general. En casos de rentas ya surjan por razón de las leyes de rentas internas o de aquellas que prescriben lo relativo al cobro de derechos sobre importaciones extranjeras, la regla que se adopta es la prescrita por el Estado de Tennessee. Exige al litigante que pague la suma como ha sido fijada por el gobierno y le autoriza para demandar al colector y probar en dicha acción la ilegalidad de la contribución. No hay en esto nada ilegal, ni siquiera riguroso. Es una precaución sabia y razonable para la seguridad del gobierno. No podría existir ningún gobierno que permitiera que el cobro de sus rentas fuera demorado por cada hombre litigioso, o que presentara dificultades para quien era más importante la demora que el pago de costas.

''Creemos que no hay razón para asegurar que un remedio rápido y eficaz no ha sido prescrito para hacer valer la reclamación que presenta él demandante. Esta es la única cuestión que ha sido debidamente sometida al tribunal, y somos de la opinión que la misma no revela fundamento alguno para revocar la sentencia de la corte inférior.

''Las otras cuestiones importantes que han sido discutidas en la opinión de la corte inferior y argumentadas por los abogados no es

preciso que ahora las consideremos; no han sido promovidas ahora. *Se confirma la sentencia."   Tennessee* v. *Sneed,* 96 U. S. 69, 74.

Por virtud de la decisión de la Corte Suprema de los Estados Unidos que acabo de analizar, quedó consagrado el principio de que una ley que fija un método como el establecido en la No. 35 de 1911, es perfectamente válida y eficaz.

En el caso de *Briscoe* v. *McMillan, supra,* varios ciudadanos del condado de Knox iniciaron un procedimiento de *injunction* para impedir la tasación y cobro de contribuciones de acuerdo con cierta resolución de la Junta de Igualamiento del Estado, alegando que dicha resolución era ilegal y absolutamente nula. La solicitud fué desestimada en primera instancia y en apelación.

En su opinión la Corte Suprema de Tennessee, después de decidir que el caso no estaba comprendido dentro de las prescripciones de la ley sobre devolución de contribuciones pagadas bajo protesta, ya que no se había llegado a cobrar contribución alguna, se expresó así:

"La siguiente cuestión en la cual se insiste se refiere a que el remedio de los demandantes, si alguno tienen, está en el tribunal de derecho mediante *certiorari.* La demanda, sin embargo, continúa basada en la idea de que la tasación hecha por la Junta de Igualamiento del Estado es absolutamente nula y si tal es el caso que se presenta en la demanda creemos que la jurisdicción de la corte de equidad está bien definida. *National Bank of Chattanooga* v. *Mayor and Aldermen,* 8 Heisk, 814; *Alexander* v. *Henderson,* 105 Tenn. 431, 58 S. W. 648.

"Es cierto que las leyes de 1903, página 674, c. 258, sección 38, subdivisión 10, prescriben expresamente que la acción de la Junta del Estado 'será definitiva y concluyente en cuanto a todas las cuestiones resueltas por la junta y que se cobrarán contribuciones sobre la valoración así fijada y declarada por la Junta del Estado.' Se observará que no se prescribe ninguna forma por esta ley mediante apelación o de otro modo para revisar la acción tomada por la Junta del Estado, sino por el contrario la ley dispone expresamente que la acción de la Junta del Estado será definitiva. Generalmente esta condición haría que el remedio mediante *certiorari* fuera peculiarmente adecuado, pero si como se alega en la demanda la acción de

la Junta de Igualamiento del Estado es nula, entonces la jurisdic-
ción de una corte de equidad para impedir la ejecución de una sen-
tencia nula es reconocida universalmente. En tal caso es comple-
tamente inmaterial que la ley disponga·que la acción de la Junta del
Estado será definitiva, puesto que dicha acción solamente se refiere·
al ejercicio legal de la jurisdicción de la junta y no a actos que son
absolutamente nulos.'' *Briscoe* v. *McMillan,* 117 Tennessee, 128.

La anterior decisión demuestra que en el Estado de Ten-
nessee al par que la ley sobre devolución de contribuciones
pagadas bajo protesta, existe una Junta de Igualamiento cu-
yas resoluciones tienen el carácter de firmes. Siendo esto
así, no anduvo errada la Corte Suprema de Puerto Rico
cuando en el caso de *Sucesión Puente* v. *El Pueblo,* 19 D. P. R.
557, 565, dijo que la función de la ley número 35 de 1911 no
fué en verdad la de derogar las disposiciones del Código
Político relativas a la Junta de Revisión e Igualamiento.

En el caso ͏de *Bank* v. *Memphis, supra,* se sostiene lo deci-
dido en *Ward* v. *Alsup,* 100 Tenn. 746, que analizaré en se-
guida, pero se establece que cuando la contribución es nula
por falta de autoridad para imponerla, entonces no es nece-
sario acudir previamente a la Junta de Igualamiento, pu-
diendo la persona que paga la contribución bajo protesta
obtener la devolución de la misma recurriendo directamente
a los tribunales de justicia.

El caso de *Ward* v. *Alsup,* ocupa ciento treinta y una pági-
nas del tomo 100 de las decisiones de Tennessee. Se trans-
criben documentos y alegatos presentados por las partes y
al fin la corte se limita a desestimar las pretensiones del de-
mandante por no haber éste acudido previamente a la Junta
de Igualamiento en defensa de su derecho. En el curso de
su opinión la corte se expresó así:

''La materia general sobre corrección de tasaciones ilegales, exce-
sivas e indebidas ha sido considerada por el Sr. Desty en su obra
sobre Contribución, tomo 2, páginas 625-627, y también en las pági-
nas 654, 661. Se verá que mucho de esto depende de los estatutos
del Estado, y de los medios y modos prescritos para su corrección,
pero el principio general es que cuando se establece un tribunal y se

prescribe una forma, debe recurrirse a ellos antes de que el contribuyente pueda tener un remedio ordinario en la ley.

"En resumen, dice, 'Por regla general el remedio estatutorio es exclusivo para una mera irregularidad y la parte debe recurrir al mismo o sufrir las consecuencias de su descuido, y si no hace que su tasación sea corregida y perfeccionada cuando tiene facultad para hacer esto, se supone que admite la corrección de dicha tasación, pudiendo la corte a su discreción negarse a prestarle su ayuda, y si la tasación no es fraudulenta, pierde todo su remedio.'

"Procede llamar de nuevo la atención de que en este caso no solamente no se alega la conducta fraudulenta por parte de los tasadores, sino que se hace expresa renuncia de la misma. Véanse también los casos citados por el autor en apoyo de su teoría.

"Otra vez dice dicho autor: 'cuando una persona alega que la tasación de contribuciones fué excesiva pero dejó de acudir a la Junta de Apelaciones para hacer que el error fuese corregido y no se presenta ninguna excusa para haber dejado de acudir a su debido tiempo, las cortes no pueden intervenir para demorar el cobro de la contribución.' 2 Desty sobre Tasación, 654, y casos citados.

"Y de nuevo en la página 662 dice lo siguiente: 'Si un contribuyente por dejar de utilizar un remedio para corregir irregularidades en la tasación e imposición de contribuciones renuncia o pierde su derecho para oponerse al cobro de las contribuciones, la exigencia del pago por parte del Tesorero no es ilegal o errónea. Si no se hace uso de ese remedio, la contribución puede ser cobrada. Si no hace que su tasación sea corregida y revisada cuando está en sus facultades el poder hacerlo, constituirá éste una admisión de su corrección. El debe proceder en la forma prescrita por el estatuto.·

"Es verdad que el estatuto de Tennessee concede al contribuyente el remedio disponiendo que el pago lo verifique bajo protesta si cree que su tasación es ilegal, injusta o excesiva o contraria a cualquier estatuto o precepto de la Constitución, estableciendo luego una acción contra el colector para que le sea devuelta la suma que de tal modo le ha sido exigida injustamente, pero el objeto de esto es claramente que el contribuyente en caso de tasaciones irregulares, indebidas o excesivas efectuadas por los debidos funcionarios, deberá haberse quejado a la junta que ha sido nombrada de acuerdo con el estatuto para oir dicha queja o investigar acerca de la tasación y en la forma en que se ha hecho, y si es o no excesiva. El depositario del Condado no tiene facultad para hacer esto sino solamente para

cobrar aquellas contribuciones que vengan a sus manos ya tasadas, excepto en ciertos casos de propiedades que han sido omitidas, etc.

"Si una persona se propone impugnar todo el sistema de tasaciones o la tasación especial de su propiedad en particular mediante la acción prescrita en el estatuto para recobrar la suma que le fué exigida, debe ponerse en condiciones de poder hacerlo, presentando primero su queja a la junta nombrada para oir tales quejas de conformidad con la ley y dentro del término dispuesto por el estatuto. El estatuto que prescribe que el contribuyente deberá pagar sus contribuciones bajo protesta y establecer luego una acción para recobrar las mismas, remedio que debe ser exclusivo, tuvo por objeto impedir que dejaran de cobrarse las contribuciones mediante *injunction* u otro procedimiento de manera que las rentas del Estado no estuvieran confundidas con el litigio, pero la teoría era que si la tasación había llegado a tal estado que había sido impuesta la contribución y podía cobrarse, el contribuyente debía entonces verificar el pago y utilizar su remedio para recobrar la cantidad pagada. Pero para que pueda tener este remedio a falta de fraude u otro motivo que justifique una intervención equitativa dicho contribuyente deberá haber recurrido a aquellos preceptos del estatuto por virtud de los cuales se hubiera podido corregir la injusticia que se alega, antes de que se impusiera la contribución y de que pudiera cobrarse." *Ward* v. *Alsup,* 100 Tenn. Rep. 747, *et seq.*

En el caso de *Tamble* v. *Pullman Co., supra,* vuelve otra vez a citarse el precepto legal vigente en Tennessee que determina que las resoluciones de la Junta de Igualamiento serán finales y conclusivas, pero se decide, de acuerdo con el caso de *Briscoe* v. *McMillan, supra,* que esto no obstante, cuando se trata de resoluciones enteramente nulas, las cortes pueden intervenir y dejarlas sin efecto.

Las decisiones citadas por el apelante no sostienen, pues, sus pretensiones. La duda que pudiera dejar en la mente el lenguaje usado por la Corte Suprema de Tennessee en el caso de *Ward* v. *Alsup, supra,* con respecto a la interpretación de la ley sobre devolución de contribuciones pagadas bajo protesta como una especie de recurso de revisión contra todas las resoluciones de la Junta de Igualamiento, desaparece cuando se observa la insistencia con que la misma

corte sostiene la vigencia del precepto legal relativo a lo conclusivo de las resoluciones de dichas juntas, y sobre todo si se tiene en cuenta que la repetida corte en el caso de *Bank v. Memphis,* 116 Tenn. 641, 656, en el que se siguió el procedimiento marcado por la ley sobre devolución de contribuciones pagadas bajo protesta, dijo:

"Se insiste en que la acción de la Junta de Igualamiento fué nula porque uno de sus miembros no era propietario de bienes raíces, por cuanto que la ley exige que la junta estará compuesta de propietarios de bienes inmuebles. Semejante cuestión no puede ser promovida *mediante una impugnación colateral, como la presente,* contra la acción tomada por la junta." *Bank* v. *Memphis,* 116 Tenn. 656.

A virtud de todo lo expuesto, es necesario concluir que la Junta de Revisión e Igualamiento existe en la actualidad en Puerto Rico con los mismos poderes que tenía con anterioridad a la vigencia de la Ley No. 35 de 1911, y que esta ley no concedió un recurso ordinario de apelación o revisión contra las decisiones de la indicada junta. El recurso establecido por dicha ley es independiente, original y está limitado a los casos de contribuciones injustas e ilegales. ¿Cuáles son esos casos?

La palabra *"ilegal"* usada en la Ley No. 35 de 1911, es bien clara. Cuando se cobra una contribución no autorizada por la ley, puede ejercitarse el derecho que confiere el estatuto. No importa que haya intervenido el Tesorero y que la Junta de Revisión e Igualamiento hubiere decidido la cuestión. La ilegalidad quedará siempre en pie y podrá ser investigada por los tribunales de justicia. Como ilustración, citaré el caso de *Union Central Life Insurance Co.* v. *Tesorero de Puerto Rico,* 19 D. P. R. 900. En dicho caso había intervenido la Junta de Revisión e Igualamiento y esto no obstante la Corte Suprema mandó devolver las contribuciones cobradas de acuerdo con la decisión de la junta, porque entendió que la propiedad tasada estaba exenta por la ley del pago de contribución y por tanto que su cobro era *ilegal.*

La palabra *"injusto"* usada también en la Ley No. 35,

se presta a una interpretación más o menos extensa. Significa lo que no es justo, lo que es contrario u opuesto a la justicia. *Justo* lo que es arreglado a justicia. Y *justicia* la virtud que inclina a dar a cada uno lo que le pertenece.

Si se interpreta aisladamente, en su significación más amplia, tendrá que convenirse en que la ley número 35 otorga un recurso en cualquier caso en que se hubiere cometido la más leve injusticia. Dentro de un criterio estrictamente recto, el cobro de un solo centavo demás en una contribución perfectamente legal, constituiría una injusticia y, por tanto, una base suficiente para establecer el recurso.

A mi juicio tal interpretación no es procedente. A los efectos de aplicar la ley número 35, no debe perderse nunca de vista que otras leyes dan al contribuyente una amplia oportunidad para la defensa de sus derechos, para fijar, por ejemplo, con la mayor exactitud posible, el montante de las contribuciones. Me refiero a la apelación para ante la Junta de Revisión e Igualamiento. Tampoco puede olvidarse que por disposición expresa del legislador, las resoluciones dictadas por esa junta tienen el carácter de firmes. De ahí que la verdadera aplicación de la palabra *"injusto,"* de acuerdo con lo decidido por los tribunales en repetidos casos de esta naturaleza, deba limitarse a aquellos en que ha existido fraude, o manifiesta intención de perjudicar al contribuyente, o se hubieren adoptado por la junta principios erróneos para calcular la contribución. De este modo se reconocerá el valor y la eficacia del procedimiento administrativo, y se preservará la acción de los tribunales de justicia para aquellos casos en que en verdad sea necesaria. Cuando la junta actúa dentro de sus funciones, sin dañada intención, sin cometer fraude, y resuelve, siguiendo un método naturalmente justo, que una determinada persona debe satisfacer cierta contribución impuesta por la ley, su resolución es final. Su acción no está en tal caso sometida a la revisión de las cortes de justicia. Pero cuando todas o algunas de dichas circunstancias ocurren, entonces debe existir, como existe, una vía franca para

acudir a los tribunales de justicia en demanda del derecho vulnerado. Véase *Hilton* v. *Marritt,* 110 U. S. 97, 106.

"La junta fué creada"—ha dicho la Corte Suprema de los Estados Unidos—"con el fin de utilizar su juicio y sus conocimientos. *State Railroad Tax Cases,* 92 U. S. 575; *State* v. *Savage,* 65 Neb. 714, 768, 769; *In re Cruger,* 84 N. Y. 619, 621; *San José Gas Co.* v. *January,* 57 Cal. 614, 616. Dentro de su jurisdicción, a no ser por las razones ya anotadas, o sea cuando ocurre fraude o se demuestra claramente la adopción de principios erróneos, es el recurso final para ciertos derechos. El estado ha confiado estos derechos a su protección y ha confiado en su honor y capacidad, según confía la protección de otras relaciones sociales a los tribunales de justicia. En alguna parte tiene que hacerse punto final. Somos de opinión que, por más que pueda existir cualquier motivo de inquietud nada se ha probado tan clara y palpablemente, como debe probarse, de acuerdo con los principios expuestos en el caso de *San Diego Land and Town Co.* v. *National City,* 174 U. S. 739, 754, a fin de justificar estas apelaciones ante la jurisdicción extraordinaria de la Corte de Circuito." *Chicago B. & Q. Railway Co.* v. *Babcock,* 204 U. S. 585, 598.

Y el mismo tribunal en el caso de *Maish* v. *Arizona,* 164 U. S. 599, 611, se expresó como sigue:

"Debe demostrarse algo más que un error de criterio, algo que indique fraude o mala conducta. * * * Es innecesario determinar si la junta cometió error de juicio en cuanto al valor de esta propiedad, si no hubiese sido mejor el haber hecho mayor examen y haber tomado declaraciones en cuanto al costo de construcción, condición actual, etc. Asuntos de esta naturaleza se dejan generalmente a la discreción y juicio de la Junta de Revisión e Igualamiento y si ésta obra de buena fe su juicio no puede ser revocado. *Pittsburgh, Cincinnati etc. Railway* v. *Backus,* 154 U. S. 421." *Maish* v. *Arizona,* 164 U. S. 599, 611.

Habiendo llegado a las anteriores conclusiones, procederé a examinar si los hechos alegados en la demanda demuestran

que se trata en este caso de alguna contribución "injusta o ilegal" y en tal virtud si cabe el ejercicio del recurso autorizado por la repetida ley número 35 de 1911.

Ninguna de las alegaciones de la demanda demuestra que la contribución cobrada se haya impuesto sobre alguna propiedad exenta por la ley del pago de contribución, o que la misma contribución que se ha exigido, o parte de ella, no está autorizada por la ley. El fraude o la manifiesta intención por parte de la junta de perjudicar a la demandante, han quedado descartadas expresamente por la misma demandante en su alegato. La reclamación se funda únicamente en la adopción de principios erróneos para calcular la contribución impuesta a la corporación demandante.

Dicho método ha sido expuesto con suficiente amplitud en la demanda. (Véase el hecho No. 17 y siguientes de la misma.) Lo he estudiado cuidadosamente y aunque comprendo que no puede calificarse de perfecto tal como se describe, no creo que pueda decirse que es de tal manera erróneo que convierta en injusta o ilegal la tasación final llevada a efecto por la junta. El hecho de que la junta tuviera en cuenta el producto de las centrales de la isla en relación con su costo para adoptar un criterio general aplicable a todas, no quiere decir que al tasar la central de la demandante prescindiera en absoluto de considerar sus circunstancias particulares. La demandante al parecer fijó el valor de las partes componentes de su propiedad. El tesorero y la junta tasaron la propiedad en globo, dándole el valor que a juicio de ellos tenía en el momento de la tasación, y es evidente, como sostiene el apelado en su alegato, "que un molino de azúcar que está construído y en explotación, con su clientela de colonos que le suplen de caña, y con una posición establecida en el mercado para disponer de su azúcar elaborada, tiene un valor mucho mayor que el valor de las piezas aisladas de madera y hierro que constituyen el molino y el trabajo de montarlo. Este valor es legítimamente considerado

para llegar a obtener el valor de la propiedad tangible y es una parte componente de la contribución sobre la propiedad. Que se dió el debido peso a esa circunstancia, queda aparentemente demostrado por el párrafo 11 de la demanda cuando en ella se expresa que en la tasación hecha por el Tesorero de Puerto Rico 'la tasación del molino fué fijada en globo.' "

Estoy conforme en que es cierto que la magnitud de la maquinaria de la demandante puede considerarse como base suficiente para deducir que su costo proporcional ha sido menor que el de otras más pequeñas aisladamente instaladas; pero también puede sostenerse que la magnitud del negocio de la demandante envuelve una economía proporcional en su explotación, produciendo, proporcionalmente, con menos, más, y quedando así aumentado por los resultados obtenidos el valor efectivo y actual de su maquinaria. El valor no es algo que pueda calcularse con exactitud matemática en todas ocasiones y en verdad que parece que el método adoptado por el Tesorero y sostenido por la junta es el mejor para asegurar una tasación eficaz y sobre todo honrada, sin privilegios para nadie, por igual para todos, de las centrales de Puerto Rico.

Una cuestión parecida surgió con respecto al derecho de un Estado para imponer contribuciones a una corporación dentro de sus límites. La Corte Suprema de los Estados Unidos resolvió que en casos de compañías telegráficas el Estado podía imponerles contribución en proporción al valor de su propiedad, según la relación que guardara la longitud de sus líneas dentro del Estado con respecto a la longitud total de la línea. *Western Union Telegraph Co.* v. *Taggart,* 163 U. S. 1. Dicha regla se aplicó también a ferrocarriles. *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U. S. 18, 26.

Por virtud de todo lo expuesto, opino que los errores señalados por el apelante en su alegato, deben resolverse así:

1. No existe. Los hechos alegados en la demanda no demuestran que la resolución de la Junta de Revisión e Igua-

lamiento de que se trata en este caso, sea ilegal, ni injusta, en ninguna de las acepciones que se ha dado a esta última palabra de acuerdo con la ley y la jurisprudencia, y, por tanto, dicha resolución tiene el carácter de firme y no puede ser colateralmente atacada dentro de este procedimiento iniciado de conformidad con la ley número 35 de 1911.

2. Tampoco existe. El propósito de la ley No. 35 de 1911 no fué el de proveer en absoluto una revisión judicial completa de todos los actos de la Junta de Revisión e Igualamiento. El recurso que autoriza dicha ley es original, independiente, y está limitado a casos en que (*a*) se hubiere cobrado una contribución no autorizada por la ley, (*b*) se hubiere cometido fraude, (*c*) se hubiere actuado con la manifiesta intención de perjudicar al contribuyente, y (*d*) se hubieren adoptado principios erróneos para calcular la contribución.

3. Tampoco existe. Si bien es cierto que el caso de la *Sucesión Puente* v. *El Pueblo,* 19 D. P. R. 557, no es análogo al presente, es aplicable la doctrina en el mismo establecida. Dicho caso, otro seguido entre las mismas partes y reportado en 19 D. P. R. 586, y los ya citados de *Caneja* v. *Pueblo,* 12 D. P. R. 245 y *Guitián* v. *El Gobierno de Puerto Rico,* 12 D. P. R. 252, deben interpretarse en armonía con los principios que se establecen en este de *Ensenada Estates, Inc.,* v. *Richardson.*

4. Tampoco existe. Sometido a examen, se ha concluído que el método adoptado por la Junta de Revisión e Igualamiento para calcular la contribución impuesta en este caso no es ilegal, ni de tal manera erróneo que pueda concluirse que constituye una injusticia.

En tal virtud debe desestimarse el recurso de apelación interpuesto y confirmarse la sentencia recurrida.